(22 P.3d 1086)

No. 85,030

IN THE MATTER OF THE ESTATE OF
MARSHALL G. GARDINER, Deceased.

Opinion filed May 11, 2001.

*Sanford P. Krigel* and *Karen S. Rosenberg*, of Krigel & Krigel, P.C., of Kansas City, Missouri, for appellant J'Noel Gardiner.

*William M. Modrcin* and *David G. Watkins*, of Morrison & Hecker L.L.P., of Kansas City, Missouri, and *John F. Thompson*, of Davis, Beall, McGuire & Thompson, of Leavenworth, for appellee Joseph M. Gardiner, III.

*Lisa Nathanson*, of American Civil Liberties Union of Kansas and Western Missouri, of Kansas City, Missouri, for *amicus curiae* ACLU of Kansas and Western Missouri, and *Doni Gewirtzman, Ruth E. Harlow, Beatrice Dohrn*, and *Evan*

*Wolfson*, of Lambda Legal Defense and Education Fund, Inc., of New York, New York, and *Pamela Sumners*, of American Civil Liberties Union of Illinois, of Chicago, Illinois, for *amicus curiae* Gender Public Advocacy Coalition.

*Aronda Strutt Kerns*, of Wichita, and *Patrick T. Gillen*, of Thomas More Center for Law & Justice, of Ann Arbor, Michigan, for *amicus curiae* Thomas More Center for Law & Justice.

Before GERNON, P.J., KNUDSON and BEIER, JJ.

GERNON, J.: This is an appeal from an order issued by the district court granting summary judgment to Joseph M. Gardiner, III, (Joe) finding the marriage between Joe's father, Marshall G. Gardiner, and J'Noel Gardiner to be void under Kansas law and denying partial summary judgment to J'Noel. We reverse and remand with instructions.

We note that this is the type of case in which the courts are required not only to weigh the legal issues but also to weigh the overlapping and sometimes conflicting positions of the parties and various interested groups. We acknowledge the several briefs filed by each side and the *amicus curiae* briefs filed by the Gender Public Advocacy Coalition/American Civil Liberties Union of Kansas and Western Missouri and The Thomas More Center for Law & Justice. Each has been helpful.

Some cases lend themselves to precise definitions, categories, and classifications. On occasion, issues or individuals come before a court which do not fit into a bilateral set of classifications. Questions of this nature highlight the tension which sometimes exists between the legal system, on the one hand, and the medical and scientific communities, on the other. Add to those concerns those whose focus is ethics, religion, lifestyle, or human rights, and the significance of a single decision is amplified. We recognize that this may be such a case.

We concur with the observation made by the Supreme Court of Vermont when it wrote:

"It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle." *In re B.L.V.B.*, 160 Vt. 368, 376, 628 A.2d 1271 (1993).

## I-Marriage Issue

I-A Court Procedural Background

Marshall died intestate on August 12, 1999. He was a resident of Leavenworth County, Kansas.

Joe filed a petition for letters of administration with the District Court of Leavenworth County, Kansas. Joe named himself and J'Noel, Marshall's surviving spouse, as Marshall's heirs. In his petition, Joe argued that J'Noel had waived any rights to Marshall's estate, and, thus, he was the sole heir-at-law to Marshall.

J'Noel filed an objection to Joe's petition. J'Noel also applied for letters of administration. The court then appointed a special administrator to handle the estate. Joe filed an objection to J'Noel's application.

Joe then petitioned the district court to amend his pleadings. In his amended petition, Joe named himself as Marshall's sole heir. Joe denied that Marshall and J'Noel were validly married. He contended that J'Noel was previously known as Jay N. Ball and was born a man. He argued that despite surgery, a name change, and other steps taken by J'Noel to change sex, she remains a man for the purposes of Kansas law relating to the issuance of a marriage license. Joe argued that the marriage between Marshall and J'Noel is void since, pursuant to K.S.A. 2000 Supp. 23-101, marriages between persons of the same sex are prohibited. Therefore, Joe claimed, J'Noel had no right to a share of Marshall's estate as the surviving spouse.

Joe also argued fraud regarding the waiver of J'Noel's rights and fraud in the inducement to marry in that Marshall did not know J'Noel was born a man. Even if the purported marriage was valid, he stated, J'Noel executed a waiver of any interest in Marshall's assets. Joe also alleged that a premarital agreement was entered into by both parties.

J'Noel filed a response to Joe's objection to her petition for issuance of letters. In the response, J'Noel asserted that her marriage to Marshall was valid. J'Noel argued that she is a biological female, and, as such, under K.S.A. 2000 Supp. 23-101, she is not prohibited from marrying Marshall, a biological male. J'Noel also stated that

there is no evidence that she, through a memo written to Marshall, intended to waive any interest in Marshall's property and that no premarital agreement was ever entered into by her and Marshall. J'Noel further asserted that she told Marshall about the sex reassignment surgery she had undergone before the marriage.

Joe moved for summary judgment on the basis of waiver and estoppel and the invalidity of the marriage between J'Noel and Marshall under K.S.A. 2000 Supp. 23-101 due to fraud. J'Noel moved for partial summary judgment on the issue of whether she is legally a female and was a female at the time of the marriage to Marshall. In a memorandum in support of her motion, J'Noel argued that the district court is required to give full faith and credit to the Wisconsin court order changing her sex to female on her birth certificate and to the new birth certificate that was issued.

The district court heard oral arguments on the motions. The court denied Joe's motion with respect to the waiver and estoppel, finding disputed facts in that issue. However, the court granted Joe's motion with respect to the issue of the validity of the marriage, finding that J'Noel was born a male and remains a male for purposes of marriage under Kansas law.

The court found that the marriage between J'Noel and Marshall is void under K.S.A. 2000 Supp. 23-101, that J'Noel is not Marshall's surviving spouse, and therefore, that J'Noel is not entitled to a spousal share under the laws of intestate succession.

The court then stated that J'Noel has no interest in or right to Marshall's estate. Accordingly, J'Noel's motion for partial summary judgment was denied. J'Noel appeals.

## I-B Personal Background

J'Noel was born in Green Bay, Wisconsin. J'Noel's original birth certificate indicates J'Noel was born a male. The record shows that after sex reassignment surgery, J'Noel's birth certificate was amended in Wisconsin, pursuant to Wisconsin statutes, to state that she was female. J'Noel argued that the order drafted by a Wisconsin court directing the Department of Health and Social Services in Wisconsin to prepare a new birth record must be given full faith and credit in Kansas.

Marshall was a businessman in northeast Kansas who had accumulated some wealth. He had one son, Joe, from whom he was estranged. Marshall's wife had died some time before he met J'Noel. There is no evidence that Marshall was not competent. Indeed, both Marshall and J'Noel possessed intelligence and real world experience. J'Noel had a Ph.D in finance and was a teacher at Park College.

J'Noel met Marshall while on the faculty at Park College in May 1998. Marshall was a donor to the school. After the third or fourth date, J'Noel testified that Marshall brought up marriage. J'Noel wanted to get to know Marshall better, so they went to Utah for a trip. When asked about when they became sexually intimate, J'Noel testified that on this trip, Marshall had an orgasm. J'Noel stated that sometime in July 1998, Marshall was told about J'Noel's prior history as a male. The two were married in Kansas on September 25, 1998.

There is no evidence in the record to support Joe's suggestion that Marshall did not know about J'Noel's sex reassignment. It had been completed years before Marshall and J'Noel met. Nor is there any evidence that Marshall and J'Noel were not compatible.

Both parties agree that J'Noel has gender dysphoria or is a transsexual. J'Noel agrees that she was born with male genitalia. In a deposition, J'Noel testified that she was born with a "birth defect"—a penis and testicles. J'Noel stated that she thought something was "wrong" even prepuberty and that she viewed herself as a girl but had a penis and testicles.

J'Noel's journey from perceiving herself as one sex to the sex her brain suggests she was, deserves to be detailed. In 1991 and 1992, J'Noel began electrolysis and then thermolysis to remove body hair on the face, neck, and chest. J'Noel was married at the time and was married for 5 years. Also, beginning in 1992, J'Noel began taking hormones, and, in 1993, she had a tracheal shave. A tracheal shave is surgery to the throat to change the voice. All the while, J'Noel was receiving therapy and counseling.

In February 1994, J'Noel had a bilateral orchiectomy to remove the testicles. J'Noel also had a forehead/eyebrow lift at this time and rhinoplasty. Rhinoplasty refers to plastic surgery to alter one's

nose. In July 1994, J'Noel consulted with a psychiatrist, who opined that there were no signs of thought disorder or major affective disorder, that J'Noel fully understood the nature of the process of transsexual change, and that her life history was consistent with a diagnosis of transsexualism. The psychiatrist recommended to J'Noel that total sex reassignment was the next appropriate step in her treatment.

In August 1994, J'Noel underwent further sex reassignment surgery. In this surgery, Eugene Schrang, M.D., J'Noel's doctor, essentially cut and inverted the penis, using part of the skin to form a female vagina, labia, and clitoris. Dr. Schrang, in a letter dated October 1994, stated that J'Noel has a "fully functional vagina" and should be considered "a functioning, anatomical female." In 1995, J'Noel also had cheek implants. J'Noel continues to take hormone replacements.

Regardless of whether one agrees with the concept of sex reassignment, one must be impressed with the resolve of, and have compassion for, any human being who undergoes such a demanding set of procedures.

After the surgery in 1994, J'Noel petitioned the Circuit Court of Outagamie County, Wisconsin, for a new birth certificate which would reflect her new name as J'Noel Ball and sex as female. The court issued a report ordering the state registrar to make these changes and issue a new birth certificate. A new birth certificate was issued on September 26, 1994. The birth certificate indicated the child's name as J'Noel Ball and sex as female. J'Noel also has had her driver's license, passport, and health documents changed to reflect her new status. Her records at two universities have also been changed to reflect her new sex designation.

## I-C The Kansas Statute: K.S.A. 2000 Supp. 23-101

J'Noel argues that the district court erred when it held that her marriage to Marshall violated K.S.A. 2000 Supp. 23-101. J'Noel argues that the legislature, through the language in K.S.A. 2000 Supp. 23-101, intended to prohibit only homosexual marriages and that her marriage to Marshall was not such a marriage.

K.S.A. 2000 Supp. 23-101 states:

"The marriage contract is to be considered in law as a civil contract *between two parties who are of opposite sex. All other marriages are declared to be contrary to the public policy of this state and are void.* The consent of the parties is essential. The marriage ceremony may be regarded either as a civil ceremony or as a religious sacrament, but the marriage relation shall only be entered into, maintained or abrogated as provided by law." (Emphasis added.)

For purposes of marriage under Kansas law, the district court found that J'Noel was born and remains a male. Since the statute requires that a marriage must be between two parties of the opposite sex, the court found that the marriage between J'Noel and Marshall was void because both individuals were males.

There is no dispute that the legislature meant to void any marriage between members of the same sex.

The question here is whether J'Noel should have been considered a female under Kansas law at the time the marriage license was issued. Subparts to that question are the criteria used to determine sex and the timing of the determination. Stated another way: Is this marriage, between a post-operative male-to-female transsexual and a male, prohibited under Kansas law?

The interpretation of a statute is a question of law for which appellate review is unlimited. *Rose & Nelson v. Frank*, 25 Kan. App. 2d 22, 24, 956 P.2d 729, *rev. denied* 265 Kan. 886 (1998).

The amendment to 23-101 limiting marriage to two parties of the opposite sex began its legislative history in 1975. The minutes of the Senate Committee on Judiciary for January 21, 1976, state that the amendment would "affirm the traditional view of marriage." The proposed amendment was finally enacted in 1980.

K.S.A. 23-101 was again amended in 1996, when language was added, stating: "All other marriages are declared to be contrary to the public policy of this state and are void." This sentence was inserted immediately after the sentence limiting marriage to two parties of the opposite sex.

In 1996, K.S.A. 23-115 was amended, with language added stating: "It is the strong public policy of this state only to recognize as valid marriages from other states that are between a man and a woman."

The legislative history contains discussions about gays and lesbians, but nowhere is there any testimony that specifically states that marriage should be prohibited by two parties if one is a post-operative male-to-female or female-to-male transsexual. Thus, the question remains: Was J'Noel a female at the time the license was issued for the purpose of the statute?

### I-D The Science

It is perhaps well to pause and attempt to define what a transsexual is by stating what a transsexual is not. A transsexual is not a homosexual. A homosexual is one who prefers the same sex for sexual contact. Nor is a transsexual a transvestite. A transvestite is one who remains one sex but gains pleasure from dressing like the other sex. A transsexual is one who experiences himself or herself as being of the opposite sex, despite having some biological characteristics of one sex, or one whose sex has been changed externally by surgery and hormones. A transsexual might be a homosexual or a transvestite also, but one does not define the other.

The scientific literature relating to studies of transsexuals is limited both in scope and history. Serious inquiry is limited to approximately the last 30 years. To state that we know everything about this issue is wrong. To state that we know more and more every year about this complex issue is more accurate. This case has the benefit of some research which preceding cases on this issue did not.

A recent study that autopsied the brains of transsexuals and others supports a conclusion that there is a scientific basis for J'Noel's assertion that she was born with a condition—specifically that she had a penis and testicles, which was evidence that she was male, but in most other senses of the word, she was female. The same science which allows us to map the genome and explore our DNA requires us to recognize these discoveries in all aspects of our lives, including the legal ramifications. We can no longer be permitted to conclude who is male or who is female by the amount of facial hair one has or the size of one's feet.

A study in the respected medical journal, The Journal of Clinical Endocrinology & Metabolism, analyzed the brains of homosexual

males, heterosexual males, heterosexual females, and male-to-female transsexuals. It concluded:

"Regardless of sexual orientation, men had almost twice as many somatostatin neurons as women. The number of neurons in . . . male-to-female transsexuals was similar to that of the females . . . . In contrast, the neuron number of female-to-male transsexual was found to be in the male range. . . . The present findings of somatostatin neuronal sex differences in the BSTc (a part of the brain) and its sex reversal in the transsexual brain clearly support the paradigm that in transsexuals sexual differentiation of the brain and genitals may go into opposite directions and point to a neurobiological basis of gender identity disorder." Kruijver, Zhou, Pool, Hofman, Gooren, and Swaab, *Male-to-Female Transsexuals Have Female Neuron Numbers in a Limbic Nucleus*, 85 The Journal of Clinical Endocrinology & Metabolism 2034 (2000).

We would be remiss if we did not recognize and mention other medical and scientific information which underscores the complexity of these issues and requires our introspection.

If one concludes that chromosomes are all that matter and that a person born with "male" chromosomes is and evermore shall be male, then one must confront every situation which does not conform with such a rigid framework of thought. There are situations of ambiguity in which certain individuals have chromosomes that differ from the typical pattern. The questions which must be asked, if not answered, are: "Are these people male or female?" and, "Should they be allowed to get married?"

Professor Julie A. Greenberg, writing in the Summer 1999 issue of the Arizona Law Review, states:

"Medical experts recognize that many factors contribute to the determination of an individual's sex. According to medical professionals, the typical criteria of sex include:
1.  Genetic or chromosomal sex—XY or XX;
2.  Gonadal sex (reproductive sex glands)—testes or ovaries;
3.  Internal morphologic sex (determined after three months gestation)—seminal vesicles/prostrate [*sic*] or vagina/uterus/fallopian tubes;
4.  External morphologic sex (genitalia)—penis/scrotum or clitoris/labia;
5.  Hormonal sex—androgens or estrogens;
6.  Phenotypic sex (secondary sexual features)—facial and chest hair or breasts;
7.  Assigned sex and gender of rearing; and
8.  Sexual identity.

"For most people, these factors are all congruent, and one's status as a man or woman is uncontroversial. For intersexuals, some of these factors may be incongruent, or an ambiguity within a factor may exist.

'The assumption is that there are two separate roads, one leading from XY chromosomes at conception to manhood, the other from XX chromosomes at conception to womanhood. The fact is that there are not two roads, but one road with a number of forks that turn in the male or female direction. Most of us turn in the same direction at each fork.'

"The bodies of the millions of intersexed people have taken a combination of male and female forks and have followed the road less traveled. These individuals have noncongruent sexual attributes. For these individuals, the law must determine which of the eight sexual factors will determine their sex and whether any one factor should be dispositive for all legal purposes.

"Because the law has typically looked to biology and the medical community for guidance in determining how an individual's sex should be legally established, the complex nature of sexual differentiation must be understood. . . .

## "A. Sexual Differentiation—The Typical Path

"During the first seven weeks after conception, all human embryos are sexually undifferentiated. At seven weeks, the embryonic reproductive system consists of a pair of gonads that can grow into either ovaries (female) or testes (male). The genital ridge that exists at this point can develop either into a clitoris and labia (female) or a penis and a scrotum (male). Two primordial duct systems also exist at this stage. The female ducts are called Mullerian ducts and develop into the uterus, fallopian tubes and the upper part of the vagina if the fetus follows a female path. The male ducts are called Wolffian ducts and are the precursors of the seminal vesicles, vas deferens and epididymis.

"At eight weeks, the fetus typically begins to follow one sex path. If the fetus has one X and one Y chromosome (46XY), it will start down the male path. At eight weeks, a 'master switch' on the Y chromosome, called the testis-determining factor, signals the embryonic gonads to form into testes. The testes begin to produce male hormones. These male hormones prompt the gonads and genitalia to develop male features. Additionally, the testes produce a substance called Mullerian inhibiting factor that causes the female Mullerian ducts to atrophy and be absorbed by the body, so that a female reproductive system is not created.

"Because the typical female fetus is 46XX and does not have a Y chromosome, the master switch that leads to the development of male organs is not turned on. The fetus continues on what is considered the default path and in the thirteenth week the gonads start to transform into ovaries. Because no testes exist to produce male hormones, the remainder of the sexual system develops along a female path. During this time, the Wolffian (male) ducts shrivel up. In other words, unless the body is triggered by hormonal production to follow the male path, the fetus will normally develop as a female. Therefore, although chromosomes generally control the hormones that are produced, it is actually the hormones that directly affect sexual development.

. . . .

### "B. Sexual Differentiation—Intersexuals: The Paths Less Followed

"Two circumstances may lead to an intersexual condition: (1) failure to meet the typical criteria within any one factor; or (2) one or more factors may be incongruent with the other factors.

"1. *Ambiguity Within a Factor*

"a. Chromosomal Ambiguity—Certain individuals have chromosomes that differ from the typical pattern of either XY or XX. Doctors have discovered people with a variety of combinations including: XXX, XXY, XXXY, XYY, XYYY, XYYYY, and XO.

"b. Gonadal Ambiguity—Some intersexuals do not have typical ovaries or testes. Instead, they have 'streak' gonads that do not appear to function as either ovaries or testes. Others have ovotestes, a combination of both male and female gonads. Still others have one ovary and one testis.

"c. External Morphologic Sex—Some individuals' external genitalia are neither clearly male nor clearly female. In addition, some women have clitoral hypertrophy, a clitoris that is larger than the typical clitoris, may more closely resemble a penis, and is sometimes accompanied by an internal vagina.

"d. Internal Morphologic Sex—Some individuals have incomplete internal sex organs or a complete absence of an internal sex organ. In addition, some individuals are born with a combination of male and female internal organs.

"e. Hormonal Sex—The male hormones are referred to as androgens. The female hormones are estrogen and progesterone. Although they are referred to as male and female hormones, all human sex hormones are shared by men and women. Typically, men and women have hormones of each type, but the levels of production and reception of each hormone are highly variable among all individuals. Different medical disorders further influence levels of hormone production and/or reception.

"f. Phenotypic Sex—Individuals may have a variety of combinations of incongruent phenotypic characteristics. In other words, an individual may have characteristics that are typically associated with a male (heavy facial hair) and characteristics that are typically associated with a female (developed breasts).

"g. Assigned Sex/Gender of Rearing—Although it occurs rarely, some parents have raised their child as a gender other than the sex that was assigned by the medical attendant at birth. In addition, in some circumstances, doctors have recommended that a child be raised as the sex different from the one assigned at birth.

"h. Sexual Identity—Sexual identity refers to how individuals would identify themselves; gender identity refers to how society would identify an individual. Some individuals do not consider themselves to be either male or female; they identify themselves as a third sex.

"2. *Ambiguity Among Factors*

"Some individuals have an incongruence among the eight factors due to a sexual differentiation disorder. In other words, some factors may be clearly male, some

may be clearly female, and others may be a mixture of male and female. Incongruity among factors can result from a number of disorders and circumstances including:

a. Chromosomal sex disorders;
b. Gonadal sex disorders;
c. Internal organ anomalies;
d. External organ anomalies;
e. Hormonal disorders;
f. Gender identity disorders; and
g. Surgical creation of an intersexed condition.

"These conditions are described in detail below . . . .

"a. Chromosomal Sex Disorders

"*Klinefelter Syndrome*

"Approximately one in 500 to 1000 'males' is affected by Klinefelter Syndrome, a condition in which a mostly phenotypic male does not fall neatly into the XY chromosome complement. Individuals with Klinefelter Syndrome will typically have two or more X chromosomes. The testes, and often the penis, are smaller than in unaffected XY males.

"A diagnosis of Klinefelter Syndrome is typically not made before puberty because no easily identifiable sign exists prior to the onset of puberty. The swelling of the breasts (gynecomastia) that occurs in adolescence is typically the first sign of the existence of this intersexual condition. Most individuals with Klinefelter Syndrome report a male psychosexual orientation. Many take supplemental testosterone, which further results in a male phenotype (*e.g.* facial hair).

"*Turner Syndrome*

"Disorders of chromosomal sex also appear in phenotypic females. Turner Syndrome is a condition that affects approximately one in 5000 newborn females. Individuals with Turner Syndrome will typically have an XO chromosomal pattern, not falling neatly into the XX, XY binary system. Individuals with Turner Syndrome typically have bilateral 'streak' gonads (unformed and non-functioning gonads) instead of clearly defined ovaries or testes. The absence of complete ovaries or testes in-utero means that the fetus has little exposure to either female or male hormones. In the absence of male hormones, the fetus will follow the female path.

"Individuals with Turner Syndrome are typically shorter than XX females. They have female appearing genitalia, but little breast development in the absence of exogenous estrogen administration.

"b. Gonadal Sex Disorders—Swyer Syndrome

"Pure gonadal dysgenesis is a condition sometimes referred to as Swyer Syndrome. This syndrome is similar to Turner Syndrome in that individuals with this syndrome will have only streak gonads. In contrast to Turner Syndrome, in which a chromosome is missing (XO), individuals with Swyer Syndrome have XY (male) chromosomes. Although Swyer Syndrome individuals have a Y chromosome, the chromosome may be missing the sex-determining segment. Without this segment, the embryo cannot develop testes and as a result, the masculinizing hormones are

also missing. In the absence of the masculinizing hormones, the fetus will take the 'default' female path and will develop a uterus but will not have any ovaries.

"This condition is not apparent at birth and the child will be raised as a girl. The syndrome is generally diagnosed at puberty when the absence of a menstruation and breast enlargement causes suspicion.

"c. Internal Organ Anomalies—Persistent Mullerian Duct Syndrome

"Individuals with Persistent Mullerian Duct Syndrome have the internal organs typical of males as well as females. These individuals have a male chromosomal pattern (XY) and therefore develop testes which secrete androgen but for some reason fail to secrete anti-Mullerian hormones. The androgens cause the fetus to follow the male path and develop the external appearance and internal organs of a male. However, fallopian tubes and a uterus are also formed because the anti-Mullerian hormones are not acting to stop this development. This condition is generally not diagnosed at birth. Individuals with this syndrome are reared as males and have a male identity.

"d. External Organ Anomalies: Hermaphroditism

"Individuals who have ambiguous external genitalia (neither clearly male nor female) are commonly referred to as hermaphrodites. Hermaphrodites are often classified into three categories: true hermaphrodites, male pseudo-hermaphrodites, and female pseudo-hermaphrodites. A 'true hermaphrodite' has some ovarian and some testicular tissue. So-called 'true hermaphrodites' have either one ovary and one testis, two ovotestes (a combination of an ovary and testis in a single gonad) or some combination thereof (*e.g.* one ovotestes and one ovary). True hermaphroditic conditions are more rare than many of the other intersex conditions described in this section. A male pseudo-hermaphrodite has testes and no ovaries but some aspect of female genitalia. A female pseudo-hermaphrodite has ovaries and no testes and some aspect of male genitalia.

"A variety of disorders can lead to hermaphroditic conditions. Hermaphroditic conditions are named according to their etiology (*e.g.* Partial Androgen Insensitivity Syndrome ['PAIS'] or Congenital Adrenal Hyperplasia ['CAH']) unless the etiology of the condition remains unknown.

"True hermaphroditism is rare and the exact incidence is unknown. The chromosome count may vary but is predominantly 46XX.

"e. Hormonal Disorders

"*Androgen Insensitivity Syndrome*

"Androgen Insensitivity Syndrome ('AIS') affects approximately 1 out of every 20,000 genetic males. AIS can be either complete ("CAIS") or partial (PAIS). Individuals with AIS are born with XY chromosomes and normally-functioning testes, which would otherwise suggest a normal male fetus. Individuals with CAIS, however, have a receptor defect and are unable to process the androgens produced by the testes.

"Because the body cannot process the androgens, the fetus will follow the default path of female development. External female genitalia will form. No internal reproductive organs will form because the Mullerian inhibiting factor produced

by the testes will inhibit the growth of the uterus and fallopian tubes. The vagina will be shorter than in the typical woman (or may only be a dimple) and will end blindly because there are no female internal reproductive organs with which to connect.

"Unlike several other intersex conditions, individuals with CAIS almost always are identified as 'normal' females at birth because externally they are indistinguishable from XX females. The disorder is sometimes diagnosed in infancy because of inguinal hernias that contain the testes. Often, however, CAIS is not diagnosed until after the onset of puberty as a result of a failure to menstruate. At puberty, breasts will form because of the estrogen that is produced by the testes. Until puberty, many CAIS women have no inkling that they are other than normal XX women.

"In PAIS, an XY individual with testes will be partially receptive to androgens. Unlike individuals with CAIS, individuals with PAIS may fall anywhere along a spectrum from an almost completely male external appearance and male sexual identity to a completely female external appearance and female sexual identity. The degree to which the individual has male features depends upon the degree to which the receptors are able to process the male hormones the testes produce.

"The external phenotype of PAIS individuals will initially be determined by the degree of androgen reception in the body. Thus, a PAIS individual may have genitalia resembling either a clitoris or a penis, the labia may be fused, and during adolescence there may be breast development due to the conversion of testosterone produced by the gonads to estradiol, an estrogen compound.

*"5-Alpha-Reductase Deficiency*

"This condition is similar to the androgen resistance syndromes. Individuals with 5-Alpha-Reductase Deficiency have XY chromosomes and testes but appear phenotypically female at birth. This condition results from the body's failure to convert testosterone to dihydrotestosterone, the more powerful form of androgen responsible for the development of male external genitalia. Despite a female appearance during childhood, by the onset of puberty, the body will masculinize. The testes descend, the voice deepens, muscle mass substantially increases, and a 'functional' penis that is capable of ejaculating develops from what was thought to be the clitoris. The prostate, however, remains small and beard growth is scanty. Although the individual is typically raised as a girl, at puberty, psychosexual orientation typically becomes male. In other words, virilization will occur at puberty in the absence of medical intervention.

"5-Alpha-Reductase Deficiency is an inheritable condition, and has resulted in a large group of affected individuals in some communities in the Dominican Republic. In some cases, a diagnosis is made in early puberty, male external development is arrested, and the individual will take exogenous female hormones to simulate a female puberty. In these cases, the individual will often have a female sexual identity. Other individuals with 5-Alpha-Reductase Deficiency will develop a masculine appearance in conformity with their genotype and will also develop a male psychosexual identification.

*"Congenital Adrenal Hyperplasia*

"Some individuals with XX chromosomes, ovaries, and other female internal structures have a more masculinized external appearance and/or demeanor due to an abundance of androgen production in-utero. Typical of this category is 21-Hydroxylase Deficiency Congenital Adrenal Hyperplasia ('CAH'). It occurs in approximately one out of 5000 to 15,000 births.

"Both the chromosomes and gonads of CAH individuals are indistinguishable from unaffected females. The genitals, however, may be ambiguous and may more closely resemble male genitalia.

"Some CAH individuals have been identified as males at birth and are reared as boys despite the presence of XX chromosomes and ovaries. In other cases, the masculinization of prenatal life is interrupted at birth, and the child is surgically and hormonally treated and reared as a girl. These girls often have characteristics that are popularly stereotyped as masculine. In addition, many CAH individuals identify themselves as lesbians.

*"Progestin-Induced Virilization*

"Similar to CAH is Progestin-Induced Virilization ('PIV'), which results from an abundance of male hormones in an otherwise normal XX female. PIV is caused by exposure in-utero to progestin that has been taken by the mother during pregnancy. Like individuals with CAH, PIV women will frequently have clitoral hypertrophy. In all other respects, however, they have completely female gonads.

"f. Gender Identity Disorder

*"Some individuals may be seemingly harmonious in all of the first six factors,* but do not identify themselves with the sex associated with these factors. These individuals may be said to have gender dysphoria or gender identity disorder ('GID'). Often these individuals are called transsexuals. Science has yet to definitely isolate a biological common denominator that causes these individuals to feel transgendered. A recent study, however, has determined that a section of the brain area that is essential for sexual behavior is larger in men than in women and that the brain structure of genetically male transsexuals is more similar to female brains than to male brains. Some transgendered individuals choose to undergo hormonal treatment and/or surgery so that their bodies comport with their sexual identity while other transsexuals do not choose to undergo such treatment.

"Transsexualism is not necessarily related to sexual orientation. Some transsexuals identify themselves as gays or lesbians while others identify themselves as heterosexuals. In other words, a male-to-female transsexual who has undergone surgery to acquire female genitalia may still prefer to have sex with another female, and a female-to-male transsexual may still prefer to have sex with another male.

"g. Surgical Creation of an Intersexed Condition

"In addition to cases in which intersexed individuals may be assigned a sex that does not comport with their own sexual identity, some persons have had their sexual features altered either accidentally or purposefully. For instance, some individuals have had their penises removed at a young age because they were mistakenly identified as females and the penis was considered an oversized clitoris

that required reduction. Although these cases are rare, they are illustrative of the complex nature of sexual identity.

"The most famous surgical alteration case involves a male whose penis was accidentally ablated when he was eight months old. The doctors recommended that his genitals be reconstructed to have a female appearance and that he be raised as a girl even though all other sexual factors were congruent and were male. The doctors also recommended that his 'history' as a male be hidden from him.

"This surgical alteration case made headlines in 1973. Because the doctors involved in the surgical alteration reported that the child and the parents had successfully adapted to the sex/gender alteration, sociology, psychology, and women's study texts were rewritten to argue, 'This dramatic case . . . provides strong support . . . that conventional patterns of masculine and feminine behavior can be altered. It also casts doubt on the theory that major sex differences, psychological as well as anatomical, are immutably set by the genes at conception.'

"For more than twenty years, the scientific literature continued to report that the surgical alteration was successful and the child's sexual identity was female. This case made headlines again in 1997 when Milton Diamond and Keith Sigmundson reported in the Archives of Pediatric & Adolescent Medicine that the boy who was turned into a girl was now living as a man.

"According to the Diamond and Sigmundson report, John (a pseudonym) had always thought of himself as different from other girls. As a child, he preferred 'boy' type toys and preferred to mimic his father's rather than his mother's behavior. He also preferred to urinate in a standing position although he had no penis. Because of the cognitive dissonance, Joan (a pseudonym used by the authors to describe John while he lived a female life) often had thoughts of suicide.

"At twelve, Joan was put on an estrogen regimen. She rebelled against the regimen and often refused to take the medication. At fourteen, Joan confessed to a doctor that she had suspected that she was a boy since second grade. At that point, the doctors agreed with Joan that she should be remasculinized and become John once more. At age fourteen, Joan/John returned to living as a male. He received male hormone shots and a mastectomy. He underwent surgery to reconstruct a phallus at ages fifteen and sixteen. John was eventually accepted as a boy by his peers. He is now married and helping to raise his wife's children.

"John was not born an intersexual. He became an intersexual when doctors removed his penis, constructed external female genitalia and administered female hormones. Despite this intervention, John always felt that he was not a female.

"In another recently reported similar case, a child's penis was severely damaged during a circumcision that was performed when the child was two months old. A decision was made to 'turn' the child into a girl. At seven months, surgery was performed to remove the remainder of the male genitalia and from that point on the child was raised as a girl. She was interviewed by a psychiatrist at ages sixteen and twenty-six. The results of these interviews indicate that she self identifies as a bi-sexual female whose recreational and occupational interests are more typically identified with males.

"The significance of these two reports is that they exemplify the difficulty law and medicine must confront in defining sex. At birth, these infants' sex factors were congruent and were male. After the original intervention, they were turned into intersexuals but were treated by society as if they were females. They had male chromosomes, ambiguous genitalia, and female gender assignment. As adults, one person self-identifies as a heterosexual male while the other self-identifies as a bi-sexual female.

"These studies and other reports about intersexuals have forced the medical and psychiatric communities to question their long-held beliefs about sex and sexual identity. Just as current scientific studies have caused the scientific communities to question their beliefs about sex and sexual identity, the legal community must question its long-held assumptions about the legal definitions of sex, gender, male, and female." Greenberg, *Defining Male and Female: Intersexuality and the Collision Between Law and Biology*, 41 Ariz. L. Rev. 265, 278-92 (1992).

## I-E Case Law

This is a case of first impression in Kansas. A discussion of case law on transsexualism from other jurisdictions, including another nation, may prove helpful.

The cases generally fall into three categories: cases dealing with the amendment of identification records, usually birth certificate name and/or sex changes; cases dealing with discrimination, most pointedly in the workplace; and cases dealing with marriage between a transsexual and a nontranssexual. An additional case which will be discussed deals with transsexuals and competition in sporting events. The analysis will follow the cases chronologically.

The first case in the United States to deal with transsexualism involved a petition for a change of sex on a birth certificate. In *Mtr. of Anonymous v. Weiner*, 50 Misc. 2d 380, 270 N.Y.S.2d 319 (1966), a post-operative transsexual who had assumed the name and role of a female applied to the Bureau of Vital Statistics in the New York City Health Department for a new birth certificate. The Bureau requested guidance from the Board of Health, who, in turn, called on a committee on public health of the New York Academy of Medicine to investigate the issue and make recommendations. The group called on to assist included gynecologists, endocrinologists, cytogeneticists, psychiatrists, and a lawyer.

The committee, after a detailed analysis and taking into account that at the time 10 states permitted such a change, concluded that

male-to-female transsexuals are "still chromosomally males while ostensibly females." 50 Misc. 2d at 382. Further, it was concluded that "it is questionable whether laws and records such as the birth certificate should be changed and thereby used as a means to help psychologically ill persons in their social adaption." 50 Misc. 2d at 382. Therefore, the committee found that it was opposed to a change on birth certificates in transsexualism cases.

The transsexual's application in *Weiner* was denied. In a resolution passed by the Board of Health, it was stated that " 'an individual born one sex cannot be changed for the reasons proposed by the request which was made to us. Sex can be changed where there is an error, of course, but not when there is a later attempt to change psychological orientation of the patient and including such surgery as goes with it.' " 50 Misc. 2d at 383.

In examining this issue, the New York appellate court looked at the New York City Health Code provisions. The code provided for a change in birth certificate only if the Commissioner of Public Health was satisfied that the evidence shows true facts and that an error was made at the time of preparing and filing of the certificate. 50 Misc. 2d at 383. The court found that based on the code provision, the Board did not act arbitrarily, capriciously, or in an otherwise illegal manner. The decision of the Board to deny the transsexual's request was affirmed. 50 Misc. 2d at 385. By upholding the Board, the court then, indirectly, adopted the Academy's position.

However, a civil court in New York, in 1968 and then again in 1970, granted an application for a change of name to a post-operative transsexual. *Matter of Anonymous*, 57 Misc. 2d 813, 293 N.Y.S.2d 834 (1968); *Matter of Anonymous*, 64 Misc. 2d 309, 314 N.Y.S.2d 668 (1970). In the 1968 case of *Anonymous*, a male-to-female transsexual petitioned the court to order the Bureau of Vital Statistics of the Department of Health of the City of New York to change his birth certificate to reflect a name and sex change. Based on New York law, the civil court lacked jurisdiction to change the sex on the birth certificate. 57 Misc. 2d at 813-14. Even so, the court still criticized the findings of the Academy.

The court noted that all male organs had been removed and that the petitioner could no longer have sex as a male. The court stated that where, with or without medical intervention, the psychological sex and the anatomical sex are "harmonized," then the social sex or gender of the individual should conform to the harmonized status of the individual, and if such conformity requires a change in statistical information, the changes should be made. 57 Misc. 2d at 816.

Later, in *Mtr. of Hartin v. Dir. of Bur. of Recs.*, 75 Misc. 2d 229, 232, 347 N.Y.S.2d 515 (1973), the appellate court reaffirmed the decision in *Weiner*. We can conclude that as of the filing date of *Hartin*, New York was stating that its birth records should reflect the sex of an individual as determined at birth.

The court in *Hartin* noted in the decision that the Board minutes revealed that the Board was of the opinion that "surgery for the transsexual is an experimental form of psychotherapy by which mutilating surgery is conducted on a person with the intent of setting his mind at ease, and that nonetheless, does not change the body cells governing sexuality." 75 Misc. 2d at 232. One of the Board members was quoted as saying: " 'I would think that it would be unsound, if, in fact, there were encouragement to the broader use of this means of resolving a person's unhappy mental state.' " 75 Misc. 2d at 232. See also *Anonymous v. Mellon*, 91 Misc. 2d 375, 383, 398 N.Y.S.2d 99 (1977) (court again refused to grant a change of sex designation).

The next case, often cited, but perhaps colored by the fact that the parties lived together only 14 days of their 3-month marriage, is *Corbett v. Corbett*, 2 All E.R. 33 (1970), an English opinion dealing with transsexualism. One of the parties was a male-to-female transsexual and former female impersonator named April Ashley, who married Arthur Corbett. Arthur was a homosexual and transvestite "prone to all kinds of sexual fantasies and practices." 2 All. E.R. at 38. An English court in the probate, divorce, and admiralty division ruled that a marriage between a post-operative male-to-female transsexual and a male was void. 2 All. E.R. at 50.

After the surgery, the respondent had her passport changed to reflect a female name. The respondent also had insurance papers

changed to reflect her sex as female. An attempt to change the respondent's birth certificate failed.

In *Corbett*, some dispute existed as to whether the respondent was "intersexed," which was described then as a medical concept meaning "something between intermediate and indeterminate sex." 2 All E.R. at 43. The court rejected this notion, finding enough evidence to support the view that the respondent was born a male. 2 All E.R. at 43.

The court found that biological sex is determined at birth and cannot be changed by natural or surgical means. The respondent's operation, the court stated, cannot affect the true sex. The only cases where the term "change of sex" is appropriate, the court opined, is when there has been a mistake as to sex at birth that is subsequently revealed in a medical examination. 2 All E.R. at 47.

In dealing with the argument that it is illogical for the court to treat the respondent as a male while other paperwork may have been changed to say differently, the court declared: "Marriage is a relationship which depends on sex and not on gender." 2 All E.R. at 49. The court distinguished marriage from other social situations. 2 All E.R. at 49. Sex is clearly an essential determinant of the relationship in marriage, the court stated, as it is recognized as the union between a man and woman. The court established a three-part test in determining what is a person's sex for purposes of the law, stating:

"Having regard to the essentially heterosexual character of the relationship which is called marriage, the criteria must . . . be biological, for even the most extreme degree of transsexualism in a male or the most severe hormonal imbalance which can exist in a person with male chromosomes, male gonads and male genitalia cannot reproduce a person who is naturally capable of performing the essential role of a woman in marriage. In other words, the law should adopt in the first place . . . the chromosomal, gonadal, and genital tests, and if all three are congruent, determine the sex for the purpose of marriage accordingly, and ignore any operative intervention." 2 All E.R. at 48.

The unusual facts and the lack of a relationship in *Corbett* make it of questionable precedential value here. We recognize that it may have been the first time a court addressed these issues in the context of marriage.

A change in thinking can perhaps be observed beginning in 1975 in *Darnell v. Lloyd*, 395 F. Supp. 1210 (D. Conn. 1975). The petitioner, called a male at birth, had a sex change operation and later requested that the Commissioner of Health change the sex on his birth certificate from male to female. The Commissioner refused to make such a change. The transsexual sued to have the Commissioner ordered to make this change, and the Commissioner moved for summary judgment.

The court denied the motion for summary judgment, finding that the Commissioner of Health must show some substantial state interest in his policy of refusing to change a birth certificate to reflect *current* sexual status unless that was also the status at birth. 395 F. Supp. at 1214. The court found that this heightened level of scrutiny exists because the court felt that the fundamental right to marry could be implicated by the Commissioner's decision. 395 F. Supp. at 1214.

The court held that the Commissioner of Health had not met his burden of proof. 395 F. Supp. at 1214. It indicated that the exact anatomical condition of the petitioner at birth was unclear, as were all of the details of the operation and present circumstances. 395 F. Supp. at 1213.

The case of *M.T. v. J.T.*, 140 N.J. Super. 77, 355 A.2d 204, *cert. denied* 71 N.J. 345 (1976), deserves greater attention, in our view, than *Corbett*, *Hartin*, or *Darnell*.

In *M.T.*, a husband and wife were divorcing, and the issue was support and maintenance. The husband argued that he should not have to pay support to his wife because she was a male, making the marriage void. The issue before the court, similar to that before this court, was whether the marriage of a post-operative male-to-female transsexual and a male was a lawful marriage between a man and a woman. The court found that it was a valid marriage. 140 N.J. Super. at 90.

In affirming the lower court's decision, the court noted the English court's previous decision in *Corbett*. 140 N.J. Super. at 85-86. The court rejected the reasoning of *Corbett*, though, finding that "for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the person's gender, psy-

che or psychological sex, then identity by sex must be governed by the congruence of these standards." 140 N.J. Super. at 87. Since the court found that the wife's gender and genitalia were no longer "discordant" and had been harmonized by medical treatment, the court held that the wife was a female at the time of her marriage and that her husband, then, was obligated to support her. 140 N.J. Super. at 89-90.

The importance of the holding in *M.T.* is that it replaces the biological sex test with dual tests of anatomy and gender, where "for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the person's gender, psyche or psychological sex, then identity by sex must be governed by the congruence of these standards." 140 N.J. Super. at 87.

The *M.T.* court further stated:

"In this case the transsexual's gender and genitalia are no longer discordant; they have been harmonized through medical treatment. Plaintiff has become physically and psychologically unified and fully capable of sexual activity consistent with her reconciled sexual attributes of gender and anatomy. Consequently, plaintiff should be considered a member of the female sex for marital purposes. It follows that such an individual would have the capacity to enter into a valid marriage relationship with a person of the opposite sex and did so here. In so ruling we do no more than give legal effect to a *fait accompli*, based upon medical judgment and action which are irreversible. Such recognition will promote the individual's quest for inner peace and personal happiness, while in no way disserving any societal interest, principle of public order or precept of morality." 140 N.J. Super. at 89-90.

In *M.T.*, the husband was arguing that he did not owe any support because his wife was a man. However, in the record, it was stated that the wife had a sex reassignment operation after meeting the husband. Her husband paid for the operation. The husband later deserted the wife and then tried to get out of paying support to someone he had been living with since 1964 and had been married to for over 2 years.

In 1977, the Oregon Supreme Court was faced with the issue of whether a birth certificate of a transsexual should be changed to reflect a different name and sex. *K. v. Health Division*, 277 Or. 371, 560 P.2d 1070 (1977). In *K.*, the court first looked to the statutes regarding birth certificate changes. The court found lim-

ited circumstances existed under the law for birth certificate amendments. The amendments, further, only dealt with name changes and only in the case of adoption or if a parent name changes. 277 Or. at 374-75.

Despite the Court of Appeals finding that the birth certificate could be amended, the Oregon Supreme Court held that no such authority existed in Oregon to change the birth certificate to reflect a change in sex or name in this instance. 277 Or. at 374-76. The court stated that "it has not been demonstrated, by legislative history or otherwise, that it would be 'at variance with the apparent policy' of either the legislature or the State Board of Health to deny the issuance of a 'new birth certificate' to a transsexual." 277 Or. at 375. The court further stated:

"In our opinion, it is at least equally, if not more reasonable, to assume that in enacting these statutes it was the intent of the legislature of Oregon that a 'birth certificate' is an historical record of the facts as they existed at the time of birth, subject to the specific exceptions provided by statute." 277 Or. at 375.

In so finding, the Supreme Court declared that "it is not for this court to decide which view is preferable. On the contrary, we hold that this is a matter of public policy to be decided by the Oregon legislature." 277 Or. at 376.

In *Richards v. U. S. Tennis Assn.*, 93 Misc. 2d 713, 400 N.Y.S.2d 267 (1977), the New York appellate court rejected the United States Tennis Association requirement that in order to be eligible to participate in a tournament, the plaintiff had to pass a sex-chromatin test. Renee Richards is a male-to-female transsexual. The court held that the test requirement was grossly unfair, discriminatory, and inequitable, and violated Richards' rights under New York Human Rights Law. 93 Misc. 2d at 721.

However, the court stated that in Richards' case, it seemed clear that the Association instituted this test for the sole purpose of preventing Richards from playing in the tournament. 93 Misc. 2d at 721. The court did not strike down the test, as such, but did indicate that the chromosome test should not be the sole criterion upon which a sex determination is made. 93 Misc. 2d at 722.

In 1984, the United States Court of Appeals, Seventh Circuit, analyzed an issue concerning transsexualism and workplace dis-

crimination. In *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984), *cert. denied* 471 U.S. 1017 (1985), a post-operative male-to-female transsexual who was a pilot for Eastern Airlines was fired in 1981, shortly after sex reassignment surgery. The transsexual sued the airline, alleging that the employer violated Title VII by discharging her from her position as a pilot. A federal district court agreed with the transsexual, finding discrimination against this person as both a female and a transsexual, and the airline appealed. 742 F.2d at 1082.

The Seventh Circuit disagreed with the district court. The court stated that while it does not condone discrimination in any form, it must hold that Title VII does not protect transsexuals. 742 F.2d at 1084. First, the court stated: "It is a maxim of statutory construction that, unless otherwise defined, words should be given their ordinary, common meaning." 742 F.2d at 1085. The court explained that the words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder. It noted that the law clearly prohibits discrimination against women because they are women or men because they are men; it does not protect a person born with a male body who believes himself to be female or a person born with a female body who believes herself to be male. 742 F.2d at 1085.

After noting that nothing was said in the legislative history about transsexuals, the court stated that it appears clear that Congress did not intend the legislation to apply to anything other than "the traditional concept of sex." 742 F.2d at 1085. Had Congress intended it to apply, surely it would have said so, the court explained. 742 F.2d at 1085. Thus, the court declined to expand the definition of "sex" as used in Title VII beyond its "common and traditional interpretation," stating: "We agree with the Eighth and Ninth Circuits that if the term 'sex' as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress." 742 F.2d at 1087. See *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748, 750 (8th Cir. 1982); *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662-63 (9th Cir. 1977).

The two most recent decisions in the United States in the area of transsexualism have dealt with the precise issue before this court,

that is, whether two individuals, biologically and legally of the same sex at birth, may contract to marry each other.

In 1987, a probate court in Ohio addressed the question in the case of *In re Ladrach*, 32 Ohio Misc. 2d 6, 513 N.E.2d 828 (1987). In *Ladrach*, a post-operative male-to-female transsexual and the transsexual's fiance, a biological male, applied for a marriage license. The application indicated that the transsexual had been married two times before to spouses of the female gender and that both marriages had ended in divorce.

After reading the application, the clerk at the license bureau called a judge who reviewed the application. The judge also reviewed a signed letter by a physician indicating that the transsexual had undergone sex reassignment surgery. After reviewing the marriage statute in Ohio, the judge concluded that the application must be denied. Later, the transsexual also filed a petition to have the sex corrected on the transsexual's birth certificate to state "Girl" instead of "Boy." This application was dismissed, and the transsexual filed a complaint for declaratory judgment to have the birth certificate changed and the marriage license issued.

The Ohio Probate Court found that the birth certificate, based on Ohio law, should not be changed. The court stated that its statute is a "correction" type statute, which permits a court to correct errors such as spelling of names, dates, race and sex, if in fact there was an error. 32 Ohio Misc. 2d at 8. Since there was no error in the designation of the transsexual as a boy, the application, the court stated, must be dismissed as to the birth certificate change. 32 Ohio Misc. 2d at 8.

The court concluded, after a review of prior case law, law review articles, and the posthearing brief of the applicant, that no authority existed in Ohio for the issuance of a marriage license to a post-operative male-to-female transsexual and a male person. 32 Ohio Misc. 2d at 10. If it is to be the public policy of the state of Ohio to issue marriage license in such cases, the court stated, "it is this court's opinion that the legislature should change the statutes." 32 Ohio Misc. 2d at 10.

The most recent decision in the United States regarding transsexualism was decided by the Texas Court of Appeals in *Littleton*

*v. Prange*, 9 S.W.3d 223 (Tex. Civ. App. 1999), *cert. denied* 531 U.S. 872 (2000). In J'Noel's case, the district court appears to rely heavily on this case in rendering its decision that J'Noel is a male, quoting some of its language verbatim. In *Littleton*, a transsexual, now called Christie, who was born a man but had undergone sex reassignment surgery, brought a medical malpractice suit under Texas' wrongful death statute as a surviving spouse of a male patient. The doctor who was sued filed a motion for summary judgment, asserting that Christie was a male and, therefore, could not be the surviving spouse of another man. The trial court granted summary judgment to the doctor, and Christie appealed.

Christie had a name and sex change made on her birth certificate during pendency of the suit. During the surgical procedures, Christie's penis, scrotum, and testicles were removed, and a vagina and labia were constructed. Christie also had breast construction surgery. One of Christie's doctors testified that Christie "has the capacity to function sexually as a female" after the surgery. 9 S.W.3d at 225. Doctors testified that medically Christie was a woman.

Christie married a man by the name of Jonathon in 1989, approximately 9 or 10 years after sex reassignment surgery. The two lived together until Jonathon's death in 1996, after which time Christie filed suit against Jonathon's doctor. In Christie's affidavit, Christie asserted that Jonathon knew about Christie's background and sex reassignment surgery.

The court in *Littleton* stated that in Texas, marriage must be between two parties of the opposite sex. 9 S.W.3d at 225. Further, in order for Christie to sue under the wrongful death statute in Texas, Christie must be the surviving spouse. 9 S.W.3d at 225. Thus, if Christie was a man, summary judgment would be appropriate. After a brief review of what transsexualism is, the court next examined the case law in this area. The court discussed *Corbett* and the case of *Anonymous v. Anonymous*, 67 Misc. 2d 982, 325 N.Y.S. 2d 499 (1971). The court also referenced such cases as *M.T. v. J.T.*, *In re Ladrach*, and *K. v. Health Division*. 9 S.W.3d at 227-29.

After a review of the case law, the court concluded that Christie was a male as a matter of law. 9 S.W.3d at 231. The court noted that this was an issue of first impression in Texas. 9 S.W.3d at 230. In line with previous cases, the court stated: "[I]t is for the legislature, should it choose to do so, to determine what guidelines should govern the recognition of marriages involving transsexuals. . . . It would be intellectually impossible for this court to write a protocol for when transsexuals would be recognized as having successfully changed their sex." 9 S.W.3d at 230.

While Christie argued that amputation was " 'a pretty important step,' " the court, while agreeing, explained that it had "no authority to fashion a new law on transsexuals, or anything else. We cannot make law when no law exists: we can only interpret the written word of our sister branch of government, the legislature." 9 S.W.3d at 230.

Thus, the court found that even though surgery and hormones can make a transsexual male look like a woman, including female genitalia, and in Christie's case, even breasts, transsexual medicine does not create the internal sex organs of a woman (except for a man-made vaginal canal). There is no womb, cervix, or ovaries in the post-operative transsexual female. The chromosomes do not change. Biologically, the post-operative female is still a male. 9 S.W.3d at 230. Even though some doctors would consider Christie a female and some a male, the court concluded: "Her female anatomy, however, is all man-made. The body that Christie inhabits is a male body in all aspects other than what the physicians have supplied." 9 S.W.3d at 231.

The dissent in *Littleton* concluded that the matter could not be decided as a matter of law, that there were genuine issues of material fact, and that therefore an affirmance of summary judgment was precluded. The dissent noted that no law defined how a person's "gender" is to be determined and that since the legislature had not addressed whether a transsexual may be considered a surviving spouse under Texas law, the appellate court could not conclude that judgment should be affirmed as a matter of law. 9 S.W.3d at 232-33 (Lopez, J., dissenting).

A petition for writ of certiorari of the *Littleton* holding was denied by the United States Supreme Court on October 2, 2000.

## I-F Other Laws, Cases, Regulations, and Considerations

Kansas law allows individuals to change the sex designation on their birth certificates "with a medical certificate substantiating that a physiological or anatomical change occurred." K.A.R. 28-17-20(b)(1)(A)(i).

K.S.A. 2000 Supp. 65-2416(a) states that a birth certificate is "prima facie evidence of the facts therein stated."

Kansas does not require proof of one's sex to obtain a marriage license. K.S.A. 2000 Supp. 23-106.

The Kansas Supreme Court has stated that the " [p]ublic policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together and to prevent separation.' " *Ranney v. Ranney*, 219 Kan. 428, 431, 548 P.2d 734 (1976).

Transsexual issues have or will arise in situations involving penal institutions, schools, sports, employment, and every other situation in which perceived gender is important.

## I-G Summary Judgment

J'Noel argues that summary judgment, holding her marriage to Marshall invalid, was not appropriate because genuine issues of material fact exist as to whether she was a male or female at the time she obtained a marriage license and wed. In her motion for partial summary judgment, J'Noel stated that the issue the district court should decide was whether she was legally a female and was a female at the time of the marriage to Marshall. This was also stated by J'Noel's counsel during oral arguments on the motions. Later at the hearing, however, J'Noel's counsel stated that the court was not being asked to determine if J'Noel was male or female but was being asked to give full faith and credit to the order amending her birth certificate. J'Noel contended the birth certificate was dispositive.

The standard of review for a motion for summary judgment has been well established. Summary judgment is appropriate when the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 2000 Supp. 60-256(c).

The district court found that J'Noel was a male at the time she obtained her license and married, for purposes of K.S.A. 2000 Supp. 23-101. There is no dispute between the parties that J'Noel was born a male with male genitalia, that J'Noel's original birth certificate stated that J'Noel was a male, or that J'Noel suffers from gender dysphoria, which is characterized by a strong desire to be the opposite sex. The question really is whether J'Noel was a male or a female, for the purpose of the statute, at the time the marriage license was issued. Inherent in that question is the question of what criteria are to be used to determine the sex of an applicant at the time of the application process. Both parties agree that J'Noel's original birth certificate has been amended to state that J'Noel is a female.

The district court was provided with J'Noel's deposition and affidavits that give opinions as to whether what J'Noel has undergone indeed transformed J'Noel into a female. The affidavits are material, and they contradict each other. The district court was required to interpret K.S.A. 2000 Supp. 23-101 as to what the legislature intended when it is stated that marriage must be between two parties "who are of opposite sex." The court had to decide whether the legislature intended a marriage between a post-operative male-to-female transsexual and a male to be valid for purposes of the statute.

## II-FULL FAITH AND CREDIT

J'Noel continues to argue that the district court erred by failing to give full faith and credit to J'Noel's Wisconsin birth certificate that designates J'Noel as female. This is a question of law over which appellate review is unlimited. See *Rose & Nelson v. Frank*, 25 Kan. App. 2d 22, 24, 956 P.2d 729, *rev. denied* 265 Kan. 886 (1998).

Article IV, § 1, of the United States Constitution states:

"Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

"The general rule is that a judgment rendered by a court of one state is entitled to recognition in the courts of another state to the same extent as it has by law or usage in the courts of the state where the judgment was rendered." *State v. Pope*, 23 Kan. App. 2d 69, 80, 927 P.2d 503 (1996), *rev. denied* 261 Kan. 1088 (1997).

Joe argues that the report authorizing J'Noel's birth certificate change was not a judgment. He argues that it was not a document generated by a court but merely an administrative form provided by the state registrar.

In order to change her birth certificate, J'Noel followed Wisconsin statute § 69.15(4)(b), which provides:

"Any person with a direct and tangible interest in a birth certificate registered in this state may petition a court to change the name and sex of the registrant on the certificate due to a surgical sex-change procedure. If the state registrar receives an order which provides for such a change the state registrar shall change the name and sex on the original birth certificate, except that if the court orders the state registrar to prepare a new certificate the state registrar shall prepare a new certificate under sub.(6)."

Joe is correct that an entry made by a court clerk without direction cannot constitute an entry of judgment because the rendition of judgments is a judicial function to be performed by judges and not by clerks. See *In re Estate of Penn*, 216 Kan. 153, 157-58, 531 P.2d 133 (1975). In this case, however, the order to change the name and sex on J'Noel's birth certificate is signed by a judge. Although it also contains a place for the clerk of the court to sign, the name actually signed is "Michael Gage." It has his printed name and designation as "judge." Thus, this particular order appears to be a judgment.

Even if it were not, the Full Faith and Credit Clause of the Constitution still requires full faith and credit to be given to records of other states. United States Constitution, Article IV, § 1. Absent an overriding consideration, the certificate itself is entitled to full faith and credit.

One such overriding consideration could be violation of Kansas public policy. J'Noel argues that Kansas public policy not only is *not violated* by granting full faith and credit to the Wisconsin birth certificate but that it *supports* such an approach. Her authority is a Kansas regulation, promulgated by the Department of Health and Environment, that allows for a change of sex designation on a birth certificate, including when an anatomical change has occurred.

The regulation, K.A.R. 28-17-20(b)(1)(A)(i), states that a birth certificate may be amended after 90 days for certain limited reasons, including if "the registrant's sex . . . was incorrectly recorded or . . . a physiological or anatomical change occurred." Proof is necessary in the form of the applicant's affidavit in the first instance and a medical certificate in the second instance. K.A.R. 28-17-20(b)(1)(A)(i).

K.A.R. 28-17-20 is authorized by K.S.A. 65-2402 and implements K.S.A. 2000 Supp. 65-2422c. K.S.A. 2000 Supp. 65-2422c deals with corrections to birth certificates or records. K.S.A. 2000 Supp. 65-2422c states in part: "The secretary [of health and environment] may by regulation prescribe procedures for making *minor corrections* to certificates or records. Any certificate so corrected shall be marked 'amended,' and shall have such further markings as shall be prescribed by the secretary." (Emphasis added.)

To correct, generally, means to make right what is wrong. Black's Law Dictionary 347 (7th ed. 1999). This court could find that giving ordinary meaning to the term "correct," the Department of Health and Environment exceeded its statutory authority in promulgating K.A.R. 28-17-20(b)(1)(A)(i) as it relates to amendments of sex designations in response to anatomical changes. An administrative agency may not, under the guise of a regulation or order, substitute its judgment for that of the legislature. It may not alter, modify, or enlarge the legislative act which is being administered. *In re Tax Appeal of Newton Country Club Co.*, 12 Kan. App. 2d 638, 647, 753 P.2d 304, *rev. denied* 243 Kan. 779 (1988).

Here, it appears likely that, to the extent the regulation appears to allow for the change of a sex designation on a Kansas birth

certificate to respond to anatomical changes, it oversteps. It is highly unlikely a fundamental change of that nature was contemplated by the legislature when it passed K.S.A. 2000 Supp. 65-2422c on "minor corrections."

We note that the Texas Court of Appeals was faced with the issue of the effect of an amended birth certificate in *Littleton*. 9 S.W.3d at 231. As stated, Christie applied for and received an amended birth certificate during the pendency of that case. A Texas trial court ordered the change of sex and name on Christie's birth certificate. The Court of Appeals found that the court was not bound by this amended certificate, stating that the trial court's role in considering the petition was a ministerial one and that deeper public policy concerns were not addressed. 9 S.W.3d at 231.

Further, the Texas statute allowing for birth certificate changes allowed amendments if the record was " 'incomplete or proved by satisfactory evidence to be inaccurate.' " 9 S.W.3d at 231. While the trial court applied the term " 'inaccurate' " to the present, the Court of Appeals found that the legislature meant the term to mean at the time of birth. 9 S.W.3d at 231. Because Christie was a male at the time of birth, both anatomically and genetically, the facts in the original birth certificate were accurate and no change should have been made. 9 S.W.3d at 231.

Regardless, J'Noel's effort to rely on K.A.R. 28-17-20 to determine Kansas public policy in this case fails. The legislature sets public policy, not administrative agencies. We read the Kansas regulation as neutral, favoring neither J'Noel's nor Joe's positions on the effect of the Wisconsin birth certificate.

The intended function of the Full Faith and Credit Clause was to avoid relitigation in other states of adjudicated issues, while leaving to the law of the forum state the treatment and effect of the predetermined facts in a new situation. *Sutton v. Leib*, 342 U.S. 402, 407, 96 L. Ed. 448, 72 S. Ct. 398, *reh. denied* 343 U.S. 921 (1952). Because neither the State of Kansas nor Joe was a party to the judgment of the Wisconsin court altering J'Noel's birth certificate, it may be argued that such a judgment is not binding on either the State of Kansas or Joe. See *Riley v. New York Trust Co.*,

315 U.S. 343, 349-50, 86 L. Ed 885, 62 S. Ct. 608, *reh. denied* 315 U.S. 829 (1942) (finding that a Delaware court was free to determine domicile anew for a party who was not bound by a previous Georgia judgment relating to domicile because he was not in privity with any parties before the Georgia court). We do not find it necessary to go to that extreme, however, to affirm the district court's treatment of the certificate as nondispositive on the issue of J'Noel's sex at the time she obtained her Kansas marriage license.

Even if it is assumed that J'Noel's amended birth certificate must be given full faith and credit in Kansas, it is a well-established rule of law that Kansas must give the amended certificate only as much recognition or weight as would Wisconsin, the state in which it was issued. No greater effect need be given to any judgment of a court of one state than that given in the state where it was rendered. *Keller v. Guernsey*, 227 Kan. 480, 482, 608 P.2d 896 (1980).

Wis. Stat. § 69.21 (2000) deals with the evidentiary weight placed on vital statistic records. Wis. Stat. § 69.21(1)(c) states:

"Any certified copy of a vital record or part of a vital record issued under this subsection shall be deemed the same as the original vital record and shall be prima facie evidence of any fact stated in the vital record, except that the evidentiary value of a vital record filed more than one year after the event which is the subject of the vital record occurred or of a vital record which has been amended shall be determined by the judicial or administrative agency or official before whom the vital record is offered as evidence."

Clearly, J'Noel's original birth certificate has been amended. Both the original and amended birth certificates were before the district court. The court, based on Wisconsin law, was allowed to determine the weight of the evidence offered in the form of the birth certificate. Wis. Stat. § 69.21(1)(c). The court in Kansas appeared to give the birth certificate little or no weight, which was its option. This was not error.

## III-EQUAL PROTECTION

J'Noel argues that the district court's decision violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by not recognizing J'Noel's legal status as female and denying J'Noel the right to marry.

A new legal theory may not be asserted for the first time on appeal or raised in a reply brief. *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 622, 938 P.2d 1293 (1997). J'Noel did not note this in her response to Joe's objection to her petition for issuance of letters, her suggestions in opposition to Joe's motion for summary judgment, her motion for partial summary judgment, or at oral argument on the motions.

J'Noel argues that she could not have raised this issue at the district court level because the district court had not yet ruled on the issue of the validity of J'Noel and Marshall's marriage. J'Noel argues that she is not arguing that K.S.A. 2000 Supp. 23-101 is unconstitutional on its face but as applied to her marriage.

J'Noel's argument concerning equal protection fails. The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." When J'Noel was found by the district court to be a male for purposes of Kansas law, she was denied the right to marry a male. It logically follows, therefore, that the court did not forbid J'Noel from marrying a female. Federal law allows a state to not give effect to another state's recognition of a same-sex marriage. 28 U.S.C. §1738C (1996). Kansas law forbids same-sex marriages. K.S.A. 2000 Supp. 23-101.

## IV. FRAUD AND WAIVER

Joe argues that the district court's decision could be affirmed on the grounds of fraud and waiver. Joe's motion for summary judgment, filed with the district court, included both of these grounds. The trial court did not rule on the fraud issue, but it clearly denied Joe's motion with respect to waiver.

"A denial of a motion for summary judgment may be reviewed on appeal when asserted as a cross-appeal. See K.S.A. 60-2103(h). It is, of course, necessary that a cross-appeal be perfected in order to obtain appellate review of the adverse decision. [Citation omitted.] If no cross-appeal is filed, the trial court's undisturbed rulings would become a final decision when the case is finally adjudicated." *Grimmett v. S & W Auto Sales Co.*, 26 Kan. App. 2d 482, 484, 988 P.2d 755 (1999).

Joe did not file a cross-appeal. Therefore, the court's ruling denying Joe's summary judgment motion on the issue of waiver is not

before us, and it becomes the law of the case. See *Vaughn v. Murray,* 214 Kan. 456, Syl. ¶5, 521 P.2d 262 (1974).

With respect to the issue of fraud, summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 2000 Supp. 60-256(c).

Joe argues that J'Noel induced Marshall into marriage because she assured Marshall several times that she was not marrying him for his money. Genuine issues of material fact exist as to the fraud issue, and that issue may be considered on remand.

## CONCLUSION

This court rejects the reasoning of the majority in the *Littleton* case as a rigid and simplistic approach to issues that are far more complex than addressed in that opinion.

We conclude that a trial court must consider and decide whether an individual was male or female at the time the individual's marriage license was issued and the individual was married, not simply what the individual's chromosomes were or were not at the moment of birth.

The court may use chromosome makeup as one factor, but not the exclusive factor, in arriving at a decision.

Aside from chromosomes, we adopt the criteria set forth by Professor Greenberg. On remand, the trial court is directed to consider factors in addition to chromosome makeup, including: gonadal sex, internal morphologic sex, external morphologic sex, hormonal sex, phenotypic sex, assigned sex and gender of rearing, and sexual identity. The listed criteria we adopt as significant in resolving the case before us should not preclude the consideration of other criteria as science advances.

In many of the cases cited, there was very little history of a relationship, if any existed at all. Here, the history of the relationship appears stable and compatible.

If fraud be shown, a marriage can always be annulled, under any circumstances. While we find no badges of fraud in the record

before us, it remains a potential alternative basis to void the marriage. Here, the evidence in the appellate record to date points to a conclusion that Marshall knew of the transsexual nature of J'Noel, approved, married, and enjoyed a consummated marriage relationship with her.

Affidavits of physicians are but one piece of evidence to be considered when reaching a conclusion.

This court looks with favor on the reasoning and the language of *M.T. v. J.T.*, 140 N.J. Super. 77, 355 A.2d 204, *cert. denied* 71 N.J. 345 (1976).

Last, we note the conclusion of William Reiner, M.D., a researcher at The Johns Hopkins Hospital:

"In the end it is only the children themselves who can and must identify who and what they are. It is for us as clinicians and researchers to listen and to learn. Clinical decisions must ultimately be based not on anatomical predictions, nor on the 'correctness' of sexual function, for this is neither a question of morality nor of social consequence, but on that path most appropriate to the likeliest psychosexual developmental pattern of the child. In other words, the organ that appears to be critical to psychosexual development and adaptation is not the external genitalia, but the brain." Reiner, *To Be Male or Female—That is the Question*, 151 Arch Pediatr. Adolesc. Med. 225 (1997).

This matter is reversed and remanded for a full hearing, with the opportunity for each side to present evidence on at least the factors enumerated in the Greenberg article and with directions to consider the conclusions of this court and the legal and scientific research we rely upon.