Joseph A. Sarafite, J.
Petitioner instituted this article 78 CPLR proceeding, in the nature of mandamus, for an order directing respondent to change the sex designated on petitioner’s birth certificate from “ male ” to “ female ” and, consonant therewith, to change the given name thereon to one assumed by petitioner subsequent to birth and to issue and substitute a new certificate.
The petitioner is a transsexual. (See Benjamin, Clinical Aspects of Transsexualism in the Male and Female, vol. 18, No. 3, American Journal of Psychotherapy, 458-469 [July, 1964]; Benjamin, Nature and Management of Transsexualism: With a Report on Thirty-one Operated Cases, Western Journal of Surgery, Obstetrics and Gynecology, 72:105-111 [March-April 1964].)
“ The syndrome of transsexualism” involves “ a truly untrodden, controversial and largely unexplored field of medicine.” (Benjamin, Clinical Aspects of Transsexualism in the Male and Female, supra, p. 458.) With appropriate hesitation because of the paucity of knowledge in this area of science, transsexualism has been described by a leading authority, Dr. Harry Benjamin, as “ a striking disturbance of gender role and gender orientation * * * a disorder of the harmony and uniformity of the psycho sexual personality * * * [a] split between the psychological and the morphological sex * * * (Nature and Management of Transsexualism, supra, p. 106.)
This petitioner has undergone “ conversivo ” surgery and has assumed the name and role of a female in our society as a means of correcting the disharmony to which Dr. Benjamin refers. To consummate so far as possible this change in gender, an application for the issuance of a new birth certificate Avas submitted to the Director of the Bureau of Records and Statistics *382 of the Department of Health of the City of New York. The request was held in abeyance pending the consideration and determination by the Board of Health of the general subject of change of birth certificates of transsexuals. An earlier similar application had caused respondent’s predecessor to seek the guidance of the Board of Health.
When confronted with this need for a formulation of policy and possible implementation by regulation, the Board of Health, in recognition of the serious consequences attendant upon a decision in the affirmative or in the negative, initiated an exhaustive inquiry into the subject and called upon the New York Academy of Medicine to study the problem and to submit its recommendations to the board. This recognition of the need for full exploration of the problem posed reflects the board’s awareness of its obligation to society to ensure the accuracy of public records. It also indicates its deep concern for the individual, the transsexual, who has been described by Dr. Harry Benjamin as “ among the most miserable people I have ever met.” (Benjamin, Nature and Management of Transsexualism, supra, p. 106.) Most significant, it represents adherence to the highest standards of the administrative process.
The New York Academy of Medicine is also to be commended for assuming this delegated responsibility and for the manner in which it fulfilled its undertaking. In its report ‘ ‘ Change of Sex on Birth Certificates for Transsexuals ”, the Committee on Public Health of the New York Academy of Medicine, states: “ Because of the complexity of the subject which cuts across biology and medicine and projects into the domain of law, the Committee called on a group of specialists in several fields to study the problem. This group included gynecologists, endocrinologists, cytogenetics, psychiatrists and a lawyer.”
After detailed analysis of the many facets and ramifications of the change of sex on the birth certificate of a transsexual, including cognizance of the fact that at present 10 States have permitted such change (Alabama, California, Hawaii, Illinois, Maryland, New Jersey, North Carolina, Pennsylvania, Virginia and Tennessee), the committee concluded that:
"1. male-to-female transsexuals are still chromosomally males while ostensibly females;
“ 2. it is questionable whether laws and records such as the birth certificate should be changed and thereby used as a means to help psychologically ill persons in their social adaptation.
“ The Committee is therefore opposed to a change of sex on birth certificates in transsexualism.”
*383 “ * * * The desire of concealment of a change of sex by the transsexual is outweighed by the public interest for protection against fraud. ’ ’
On October 13,1965, the Board of Health passed the following resolution: ‘ ‘ resolved, that in view of all the evidence considered including the report of the Committee on Public Health of the New York Academy of Medicine, it is the sense of the Board of Health that the Health Code not be amended to provide for a change of sex on birth certificates in cases of transsexuals.”
At the same meeting, the board, by unanimous vote, decided to “go on record as generally favoring the recommendations of the Committee on Public Health of the Academy of Medicine, and, in effect, stating that an individual born one sex cannot be changed for the reasons proposed by the request which was made to us. Sex can be changed where there is an error, of course, but not when there is a later attempt to change psychological orientation of the patient and including such surgery as goes with it [sic].”
In accordance with the resolution and statement of policy by the Board of Health, respondent denied petitioner’s application for amendment or issuance of a new birth certificate.
The proper scope of the judicial role (other than power granted pursuant to section 61 of the Civil Bights Law) in reviewing the denial of petitioner’s application is greatly restricted. Primary jurisdiction to formulate and implement the city’s policy with regard to the records of “ birth, fetal deaths and deaths ” is vested in the Board of Health. (New York City Charter, § 567.)
The prerequisite standards for amendment of a birth certificate are prescribed by the provisions of the New York City Health Code. These provisions — which have the force and effect of statutory law — represent and reflect the plenary jurisdiction of the Board of Health in this area. (See New York City Charter, § 558; Matter of Bakers Mut. Ins. Co. [Dept. of Health], 301 N. Y. 21, 27.)
Article 207 of the New York City Health Code provides, in pertinent part, for amendment of a birth certificate only if ‘ ‘ the Commissioner or his designee is satisfied that the evidence submitted shows the true facts and that an error was made at the time of preparing and filing of the certificate, or that the name of a person named in a birth certificate has been changed pursuant to court order.” (§ 207.01, subd. [c].) The normal method of amendment is the drawing of a single line through the information subject to amendment and the insertion of the *384 correct information above it (§ 207.03, subd. [a]). An exception to this method is provided in subdivision (c) of section 207.05 which empowers the “ Commissioner or other personnel of the Department designated by him ” to file a new birth certificate if he “finds it desirable by reason of the nature and extent of the amendments ”, These two sections are the exclusive bases in the Health Code for the relief presently requested.
Thus, the critical issue before the court is whether the respondent acted in an arbitrary, capricious or otherwise illegal manner in deciding that the petitioner did not establish ‘ ‘ that the evidence submitted shows the true facts and that an error was made at the time of preparing and filing of the certificate ” and, accordingly, in denying the application for amendment and issuance of a new certificate.
The test of arbitrariness does not permit the court to substitute its views for those of the administrative body charged by law with the authority and responsibility of maintaining the records of births and deaths. In its role as ultimate arbiter of the legality of administrative action the judiciary may not arrogate to itself the power of a super-Board of Health to weigh the wisdom of respondent’s acts. (Paraphrasing Day-Brite Light, v. Missouri, 342 U. S. 421, 423.)
Indeed, the nature of the problem posed initially to the Board of Health and now to the court requires a specialized training and skill for which the board is uniquely equipped. Judicial deference to the decision of those members of the Board of Health who are physicians or otherwise uniquely qualified appears mandatory in the singular circumstances here involved.
The determination of respondent was predicated upon the decision of the Board of Health that the Health Code “ not be amended to provide for a change of sex on birth certificates in cases of transsexuals.’’ Implicit in this resolution is the board’s interpretation of the Health Code to the effect that, as presently constituted, no authorization exists for the amendment requested by petitioner. As the Supreme Court of the United States declared recently under analogous circumstances (Udall v. Tollman, 380 U. S. 1, 16): “ When faced with a problem of statutory construction * * [the] court shows great deference to the interpretation given the statute by the oEcers or agency charged with its administration. ‘ To sustain the * * * [Board’s] application of this statutory term [“ an error was made at the time of preparing and filing of the certificate”], we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial *385 proceedings.’ [citing cases] * * * When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.”
Within the context of the present record, the court concludes that judicial intervention would constitute an usurpation of the function of the executive branch of government.
In support of the petition it is argued that prior to the aforesaid study and resolution by the Board of Health, amendments were made to the birth certificates of three transsexuals by respondent’s predecessor. This fact does not militate against denial of the present application. (See Matter of Harwood v. Cornelius, 21 A D 2d 961, 962; Federal Crop Ins. Corp. v. Merrill, 332 U. S. 380.) “ There is no estoppel countenanced by the courts against public officials performing their legal duty.” (Matter of Harwood v. Cornelius, supra, p. 962.)
Accordingly, the present application is denied and the petition dismissed.
The present proceeding has not been instituted nor has it been considered by the court as an application for a change in name in compliance with section 61 of the Civil Rights Law.