No. 85,030

IN THE MATTER OF THE ESTATE OF MARSHALL G. GARDINER, Deceased.

(42 P.3d 120)

Opinion filed March 15, 2002.

*Sanford P. Krigel*, of Krigel & Krigel, P.C., of Kansas City, Missouri, argued the cause, and *Karen S. Rosenberg*, of the same firm, was with him on the briefs for appellant, J'Noel Gardiner.

*William M. Modrcin*, of Morrison & Hecker, L.L.P., of Kansas City, Missouri, argued the cause, and *David G. Watkins*, of the same firm, and *John F. Thompson*, of Davis, Beall, McGuire & Thompson, of Leavenworth, were with him on the briefs for appellee, Joseph M. Gardiner, III.

*Aronda Strutt Kerns*, of Wichita, and *Patrick T. Gillen*, of Thomas More Center for Law & Justice, of Ann Arbor, Michigan, were on the brief for *amicus curiae* Thomas More Center for Law & Justice.

*Lisa Nathanson*, of American Civil Liberties Union of Kansas and Western Missouri, of Kansas City; *Doni Gewirtzman, Ruth E. Harlow, Beatrice Dohrn*, and *Evan Wolfson*, of the Lambda Legal Defense and Education Fund, Inc., of New York, New York; and *Pamela Sumners*, of the American Civil Liberties Union of Illinois, of Chicago, Illinois, were on the brief for *amici curiae* Gender Public Advocacy Coalition and American Civil Liberties Union of Kansas and Western Missouri.

The opinion of the court was delivered by

ALLEGRUCCI, J.: J'Noel Gardiner appealed from the district court's entry of summary judgment in favor of Joseph M. Gardiner, III, (Joe) in the probate proceeding of Marshall G. Gardiner. The district court had concluded that the marriage between Joe's father, Marshall, and J'Noel, a post-operative male-to-female trans-sexual, was void under Kansas law.

The Court of Appeals reversed and remanded for the district court's determination whether J'Noel was male or female at the time the marriage license was issued. See *In re Estate of Gardiner*, 29 Kan. App. 2d 92, 22 P.3d 1086 (2001). The Court of Appeals directed the district court to consider a number of factors in ad-

dition to chromosomes. Joe's petition for review of the decision of the Court of Appeals was granted by this court.

The following facts regarding J'Noel's personal background are taken from the opinion of the Court of Appeals:

"J'Noel was born in Green Bay, Wisconsin. J'Noel's original birth certificate indicates J'Noel was born a male. The record shows that after sex reassignment surgery, J'Noel's birth certificate was amended in Wisconsin, pursuant to Wisconsin statutes, to state that she was female. J'Noel argued that the order drafted by a Wisconsin court directing the Department of Health and Social Services in Wisconsin to prepare a new birth record must be given full faith and credit in Kansas.

"Marshall was a businessman in northeast Kansas who had accumulated some wealth. He had one son, Joe, from whom he was estranged. Marshall's wife had died some time before he met J'Noel. There is no evidence that Marshall was not competent. Indeed, both Marshall and J'Noel possessed intelligence and real world experience. J'Noel had a Ph.D in finance and was a teacher at Park College.

"J'Noel met Marshall while on the faculty at Park College in May 1998. Marshall was a donor to the school. After the third or fourth date, J'Noel testified that Marshall brought up marriage. J'Noel wanted to get to know Marshall better, so they went to Utah for a trip. When asked about when they became sexually intimate, J'Noel testified that on this trip, Marshall had an orgasm. J'Noel stated that sometime in July 1998, Marshall was told about J'Noel's prior history as a male. The two were married in Kansas on September 25, 1998.

"There is no evidence in the record to support Joe's suggestion that Marshall did not know about J'Noel's sex reassignment. It had been completed years before Marshall and J'Noel met. Nor is there any evidence that Marshall and J'Noel were not compatible.

"Both parties agree that J'Noel has gender dysphoria or is a transsexual. J'Noel agrees that she was born with male genitalia. In a deposition, J'Noel testified that she was born with a 'birth defect'—a penis and testicles. J'Noel stated that she thought something was 'wrong' even prepuberty and that she viewed herself as a girl but had a penis and testicles.

"J'Noel's journey from perceiving herself as one sex to the sex her brain suggests she was, deserves to be detailed. In 1991 and 1992, J'Noel began electrolysis and then thermolysis to remove body hair on the face, neck, and chest. J'Noel was married at the time and was married for 5 years. Also, beginning in 1992, J'Noel began taking hormones, and, in 1993, she had a tracheal shave. A tracheal shave is surgery to the throat to change the voice. All the while, J'Noel was receiving therapy and counseling.

"In February 1994, J'Noel had a bilateral orchiectomy to remove the testicles. J'Noel also had a forehead/eyebrow lift at this time and rhinoplasty. Rhinoplasty refers to plastic surgery to alter one's nose. In July 1994, J'Noel consulted with a psychiatrist, who opined that there were no signs of thought disorder or major

affective disorder, that J'Noel fully understood the nature of the process of trans-sexual change, and that her life history was consistent with a diagnosis of trans-sexualism. The psychiatrist recommended to J'Noel that total sex reassignment was the next appropriate step in her treatment.

"In August 1994, J'Noel underwent further sex reassignment surgery. In this surgery, Eugene Schrang, M.D., J'Noel's doctor, essentially cut and inverted the penis, using part of the skin to form a female vagina, labia, and clitoris. Dr. Schrang, in a letter dated October 1994, stated that J'Noel has a 'fully functional vagina' and should be considered 'a functioning, anatomical female.' In 1995, J'Noel also had cheek implants. J'Noel continues to take hormone replacements.

. . . .

"After the surgery in 1994, J'Noel petitioned the Circuit Court of Outagamie County, Wisconsin, for a new birth certificate which would reflect her new name as J'Noel Ball and sex as female. The court issued a report ordering the state registrar to make these changes and issue a new birth certificate. A new birth certificate was issued on September 26, 1994. The birth certificate indicated the child's name as J'Noel Ball and sex as female. J'Noel also has had her driver's license, passport, and health documents changed to reflect her new status. Her records at two universities have also been changed to reflect her new sex designation." 29 Kan. App. 2d at 96-98.

Before meeting Marshall, J'Noel was married to S.P., a female. J'Noel and S.P. met and began living together in 1980, while J'Noel was in college. They married in 1988. J'Noel testified she and S.P. engaged in heterosexual relations during their relationship. J'Noel believed she was capable of fathering children, and the couple used birth control so S.P. would not become pregnant. J'Noel and S.P. divorced in May 1994.

J'Noel Ball and Marshall Gardiner were married in Kansas in September 1998. Marshall died intestate in August 1999. This legal journey started with Joe filing a petition for letters of administration, alleging that J'Noel had waived any rights to Marshall's estate. J'Noel filed an objection and asked that letters of administration be issued to her. The court then appointed a special administrator. Joe amended his petition, alleging that he was the sole heir in that the marriage between J'Noel and Marshall was void since J'Noel was born a man. J'Noel argues that she is a biological female and was at the time of her marriage to Marshall. There is no dispute that J'Noel is a transsexual.

According to Stedman's Medical Dictionary 1841 (26th ed. 1995), a transsexual is a "person with the external genitalia and

secondary sexual characteristics of one sex, but whose personal identification and psychosocial configuration is that of the opposite sex; a study of morphologic, genetic, and gonadal structure may be genitally congruent or incongruent." A post-operative transsexual, such as J'Noel, is a person who has undergone medical and surgical procedures to alter "external sexual characteristics so that they resemble those of the opposite sex." Stedman's Med. Dict. 1841 (26th ed. 1995). The external sexual characteristics may include genitalia, body and facial hair, breasts, voice, and facial features.

Joe opposed J'Noel's receiving a spousal share of Marshall's estate on several grounds—waiver, fraud, and void marriage in that J'Noel remained a male for the purpose of the "opposite sex" requirement of K.S.A. 2001 Supp. 23-101.

On cross-motions for summary judgment, the district court denied J'Noel's motion by declining to give full faith and credit to J'Noel's Wisconsin birth certificate, which had been amended as to sex and name. Joe's waiver argument was based on a writing that purports to waive J'Noel's interests in Marshall's property. The district court declined to conclude as a matter of law that the writing constituted a waiver. The factual issue of fraud was not decided on summary judgment. The district court granted Joe's motion with regard to the validity of the marriage on the ground that J'Noel is a male.

J'Noel appealed from the district court's entry of summary judgment against her and in Joe's favor. Joe did not cross-appeal. The Court of Appeals affirmed the district court's ruling denying J'Noel's motion for summary judgment. J'Noel did not file a cross-petition for review of that ruling, and it is not before this court. Since Joe did not file a cross-appeal of the district court's decision on waiver and fraud, those issues are likewise not before the court. The sole issue for review is whether the district court erroneously entered summary judgment in favor of Joe on the ground that J'Noel's marriage to Marshall was void.

On the question of validity of the marriage of a post-operative transsexual, there are two distinct "lines" of cases. One judges validity of the marriage according to the sexual classification assigned to the transsexual at birth. The other views medical and surgical

procedures as a means of unifying a divided sexual identity and determines the transsexual's sexual classification for the purpose of marriage at the time of marriage. The essential difference between the two approaches is the latter's crediting a mental component, as well as an anatomical component, to each person's sexual identity.

Among the cases brought to the court's attention not recognizing a mental component or the efficacy of medical and surgical procedures are *Corbett v. Corbett*, 2 All E.R. 33 (1970); *In re Ladrach*, 32 Ohio Misc. 2d 6, 513 N.E.2d 828 (1987); and *Littleton v. Prange*, 9 S.W.3d 223 (Tex. Civ. App. 1999), *cert. denied* 531 U.S. 872 (2000). Recognizing them are *M.T. v. J.T.*, 140 N.J. Super 77, 355 A.2d 204, *cert. denied* 71 N.J. 345 (1976); and *In re Kevin*, FamCA 1074 (File No. SY8136 OF 1999, Family Court of Australia, at Sydney, 2001).

The district court, in the present case, relied on *Littleton*. The Court of Appeals relied on *M.T. In re Kevin* was decided after the Court of Appeals issued its opinion, and it cites *In re Estate of Gardiner* with approval; review of that case by the full Family Court of Australia has been heard, but an opinion has not yet been issued.

*Littleton* was the source for the district court's language and reasoning. The Texas court's statement of the issue was: "[C]an a physician change the gender of a person with a scalpel, drugs and counseling, or is a person's gender immutably fixed by our Creator at birth?" 9 S.W.3d at 224. For what purported to be its findings of fact, the district court restated the Texas court's conclusions nearly verbatim (See 9 S.W.3d at 230-31):

"Medical science recognizes that there are individuals whose sexual self-identity is in conflict with their biological and anatomical sex. Such people are termed transsexuals. . . .

"[T]ranssexuals believe and feel they are members of the opposite sex. . . . J'Noel is a transsexual.

"[T]hrough surgery and hormones, a transsexual male can be made to look like a woman, including female genitalia and breasts. Transsexual medical treatment, however, does not create the internal sexual organs of a woman, except for the vaginal canal. There is no womb, cervix or ovaries in the post-operative transsexual female.

"[T]he male chromosomes do not change with either hormonal treatment or sex reassignment surgery. Biologically, a post-operative female transsexual is still a male. . . .

"The evidence fully supports that J'Noel, born male, wants and believes herself to be a woman. She has made every conceivable effort to make herself a female.

"[S]ome physicians would consider J'Noel a female; other physicians would consider her still a male. Her female anatomy, however, is still all man-made. The body J'Noel inhabits is a male body in all aspects other than what the physicians have supplied.

"From that the Court has to conclude, and from the evidence that's been submitted under the affidavits, as a matter of law, she — J'Noel is a male."

The Court of Appeals found no error in the district court's not giving the Wisconsin birth certificate full faith and credit. 29 Kan. App. 2d at 125. With regard to the validity of the marriage, the Court of Appeals reversed and remanded for the district court's determination whether J'Noel was male or female, for the purpose of K.S.A. 2001 Supp. 23-101, at the time the marriage license was issued. 29 Kan. App. 2d at 127-28.

The Court of Appeals rejected the reasoning of *Littleton* "as a rigid and simplistic approach to issues that are far more complex than addressed in that opinion." 29 Kan. App. 2d at 127. The Court of Appeals "look[ed] with favor on the reasoning and the language" of *M.T.* 29 Kan. App. 2d at 128. The Court of Appeals engaged in the following discussion of the decision in *M.T.*:

"In *M.T.*, a husband and wife were divorcing, and the issue was support and maintenance. The husband argued that he should not have to pay support to his wife because she was a male, making the marriage void. The issue before the court, similar to that before this court, was whether the marriage of a post-operative male-to-female transsexual and a male was a lawful marriage between a man and a woman. The court found that it was a valid marriage. 140 N.J. Super. at 90.

"In affirming the lower court's decision, the court noted the English court's previous decision in *Corbett*. 140 N.J. Super. at 85-86. The court rejected the reasoning of *Corbett*, though, finding that 'for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the person's gender, psyche or psychological sex, then identity by sex must be governed by the congruence of these standards.' 140 N.J. Super. at 87. Since the court found that the wife's gender and genitalia were no longer 'discordant' and had been harmonized by medical treatment, the court held that the wife was a female at the time of her marriage and that her husband, then, was obligated to support her. 140 N.J. Super. at 89-90.

"The importance of the holding in *M.T.* is that it replaces the biological sex test with dual tests of anatomy and gender, where 'for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the person's gender, psyche or psychological sex, then identity by sex must be governed by the congruence of these standards.' 140 N.J. Super. at 87.

"The *M.T.* court further stated:

'In this case the transsexual's gender and genitalia are no longer discordant; they have been harmonized through medical treatment. Plaintiff has become physically and psychologically unified and fully capable of sexual activity consistent with her reconciled sexual attributes of gender and anatomy. Consequently, plaintiff should be considered a member of the female sex for marital purposes. It follows that such an individual would have the capacity to enter into a valid marriage relationship with a person of the opposite sex and did so here. In so ruling we do no more than give legal effect to a *fait accompli*, based upon medical judgment and action which are irreversible. Such recognition will promote the individual's quest for inner peace and personal happiness, while in no way disserving any societal interest, principle of public order or precept of morality.' 140 N.J. Super at 89-90.

"In *M.T.*, the husband was arguing that he did not owe any support because his wife was a man. However, in the record, it was stated that the wife had a sex reassignment operation after meeting the husband. Her husband paid for the operation. The husband later deserted the wife and then tried to get out of paying support to someone he had been living with since 1964 and had been married to for over 2 years." 29 Kan. App. 2d at 113-14.

In his petition for review, Joe complained that the Court of Appeals failed to "ask the fundamental question of whether a person can actually change sex within the context of K.S.A. 23-101." On the issue of the validity of the marriage, Joe's principal arguments were that the Court of Appeals failed to give K.S.A. 2001 Supp. 23-101 its plain and unambiguous meaning and that the Court of Appeals' opinion improperly usurps the legislature's policy-making role.

K.S.A. 2001 Supp. 23-101 provides:

"The marriage contract is to be considered in law as a civil contract between two parties who are of opposite sex. All other marriages are declared to be contrary to the public policy of this state and are void. The consent of the parties is essential. The marriage ceremony may be regarded either as a civil ceremony or as a religious sacrament, but the marriage relation shall only be entered into, maintained or abrogated as provided by law."

Joe's principal argument is that the statutory phrase is plain and unambiguous. His statements of the issue and his position, how-

ever, go beyond the statutory phrase to pin down the time when the two parties are of opposite sex. The plain and unambiguous meaning of K.S.A. 2001 Supp. 23-101, according to Joe, is that a valid marriage must be between two persons who are of opposite sex at the time of birth.

Applying the statute as Joe advocates, a male-to-female trans-sexual whose sexual preference is for women may marry a woman within the advocated reading of K.S.A. 2001 Supp. 23-101 because, at the time of birth, one marriage partner was male and one was female. Thus, in spite of the outward appearance of femaleness in both marriage partners at the time of the marriage, it would not be a void marriage under the advocated reading of K.S.A. 2001 Supp. 23-101. As the Court of Appeals stated in regard to J'Noel's argument that K.S.A. 2001 Supp. 23-101, as applied by the district court, denied her right to marry: "When J'Noel was found by the district court to be a male for purposes of Kansas law, she was denied the right to marry a male. It logically follows, therefore, that the court did not forbid J'Noel from marrying a female." 29 Kan. App. 2d at 126.

Joe's fallback argument is that the legislature's intent was to uphold "traditional marriage," interpreting K.S.A. 2001 Supp. 23-101 so that it invalidates a marriage between persons who are not of the opposite sex, *i.e.*, a biological male and a biological female.

Joe also contends that the legislature did not intend for the phrase "opposite sex" in K.S.A. 2001 Supp. 23-101 to allow for a change from the sexual classification assigned at birth.

The other facet of Joe's argument is that policy questions are for the legislature rather than the courts. In K.S.A. 2001 Supp. 23-101 and K.S.A. 2001 Supp. 23-115, the legislature declared the public policy of recognizing only marriages between a man and a woman. K.S.A. 2001 Supp. 23-115 provides:

> "All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, shall be valid in all courts and places in this state. It is the strong public policy of this state only to recognize as valid marriages from other states that are between a man and a woman."

The Court of Appeals extensively reviewed cases involving trans-sexuals from other states and countries. Rather than restate what

already has been well stated, the Court of Appeals' discussion of cases is, in part, quoted here:

"The cases generally fall into three categories: cases dealing with the amendment of identification records, usually birth certificate name and/or sex changes; cases dealing with discrimination, most pointedly in the workplace; and cases dealing with marriage between a transsexual and a nontranssexual. An additional case which will be discussed deals with transsexuals and competition in sporting events. The analysis will follow the cases chronologically.

"The first case in the United States to deal with transsexualism involved a petition for a change of sex on a birth certificate. In *Mtr. of Anonymous v. Weiner*, 50 Misc. 2d 380, 270 N.Y.S.2d 319 (1966), a post-operative transsexual who had assumed the name and role of a female applied to the Bureau of Vital Statistics in the New York City Health Department for a new birth certificate. The Bureau requested guidance from the Board of Health, who, in turn, called on a committee on public health of the New York Academy of Medicine to investigate the issue and make recommendations. The group called on to assist included gynecologists, endocrinologists, cytogeneticists, psychiatrists, and a lawyer.

 . . . .

"The transsexual's application in *Weiner* was denied. In a resolution passed by the Board of Health, it was stated that ' " 'an individual born one sex cannot be changed for the reasons proposed by the request which was made to us. Sex can be changed where there is an error, of course, but not when there is a later attempt to change psychological orientation of the patient and including such surgery as goes with it.' " ' 50 Misc. 2d at 383.

 . . . .

"However, a civil court in New York, in 1968 and then again in 1970, granted an application for a change of name to a post-operative transsexual. *Matter of Anonymous*, 57 Misc. 2d 813, 293 N.Y.S.2d 834 (1968); *Matter of Anonymous*, 64 Misc. 2d 309, 314 N.Y.S.2d 668 (1970). In the 1968 case of *Anonymous*, a male-to-female transsexual petitioned the court to order the Bureau of Vital Statistics of the Department of Health of the City of New York to change his birth certificate to reflect a name and sex change. Based on New York law, the civil court lacked jurisdiction to change the sex on the birth certificate. 57 Misc. 2d at 813-14. Even so, the court still criticized the findings of the Academy.

"The court noted that all male organs had been removed and that the petitioner could no longer have sex as a male. The court stated that where, with or without medical intervention, the psychological sex and the anatomical sex are 'harmonized,' then the social sex or gender of the individual should conform to the harmonized status of the individual, and if such conformity requires a change in statistical information, the changes should be made. 57 Misc. 2d at 816.

"Later, in *Mtr. of Hartin v. Dir. of Bur. of Recs.*, 75 Misc. 2d 229, 232, 347 N.Y.S.2d 515 (1973), the appellate court reaffirmed the decision in *Weiner*. We

can conclude that as of the filing date of *Hartin*, New York was stating that its birth records should reflect the sex of an individual as determined at birth.

. . . .

"The next case, often cited, but perhaps colored by the fact that the parties lived together only 14 days of their 3-month marriage, is *Corbett v. Corbett*, 2 All E.R. 33 (1970), an English opinion dealing with transsexualism. One of the parties was a male-to-female transsexual and former female impersonator named April Ashley, who married Arthur Corbett. Arthur was a homosexual and transvestite 'prone to all kinds of sexual fantasies and practices.' 2 All. E.R. at 38. An English court in the probate, divorce, and admiralty division ruled that a marriage between a post-operative male-to-female transsexual and a male was void. 2 All. E.R. at 50.

"After the surgery, the respondent had her passport changed to reflect a female name. The respondent also had insurance papers changed to reflect her sex as female. An attempt to change the respondent's birth certificate failed.

"In *Corbett*, some dispute existed as to whether the respondent was 'intersexed,' which was described then as a medical concept meaning 'something between intermediate and indeterminate sex.' 2 All E.R. at 43. The court rejected this notion, finding enough evidence to support the view that the respondent was born a male. 2 All E.R. at 43.

"The court found that biological sex is determined at birth and cannot be changed by natural or surgical means. The respondent's operation, the court stated, cannot affect the true sex. The only cases where the term 'change of sex' is appropriate, the court opined, is when there has been a mistake as to sex at birth that is subsequently revealed in a medical examination. 2 All E.R. at 47.

"In dealing with the argument that it is illogical for the court to treat the respondent as a male while other paperwork may have been changed to say differently, the court declared: 'Marriage is a relationship which depends on sex and not on gender.' 2 All E.R. at 49. The court distinguished marriage from other social situations. 2 All E.R. at 49. Sex is clearly an essential determinant of the relationship in marriage, the court stated, as it is recognized as the union between a man and woman. The court established a three-part test in determining what is a person's sex for purposes of the law, stating:

'Having regard to the essentially heterosexual character of the relationship which is called marriage, the criteria must . . . be biological, for even the most extreme degree of transsexualism in a male or the most severe hormonal imbalance which can exist in a person with male chromosomes, male gonads and male genitalia cannot reproduce a person who is naturally capable of performing the essential role of a woman in marriage. In other words, the law should adopt in the first place . . . the chromosomal, gonadal, and genital tests, and if all three are congruent, determine the sex for the purpose of marriage accordingly, and ignore any operative intervention.' 2 All E.R. at 48.

"The unusual facts and the lack of a relationship in *Corbett* make it of questionable precedential value here. We recognize that it may have been the first time a court addressed these issues in the context of marriage.

"A change in thinking can perhaps be observed beginning in 1975 in *Darnell v. Lloyd*, 395 F. Supp. 1210 (D. Conn. 1975). The petitioner, called a male at birth, had a sex change operation and later requested that the Commissioner of Health change the sex on his birth certificate from male to female. The Commissioner refused to make such a change. The transsexual sued to have the Commissioner ordered to make this change, and the Commissioner moved for summary judgment.

"The court denied the motion for summary judgment, finding that the Commissioner of Health must show some substantial state interest in his policy of refusing to change a birth certificate to reflect *current* sexual status unless that was also the status at birth. 395 F. Supp. at 1214. The court found that this heightened level of scrutiny exists because the court felt that the fundamental right to marry could be implicated by the Commissioner's decision. 395 F. Supp. at 1214.

"The court held that the Commissioner of Health had not met his burden of proof. 395 F. Supp. at 1214. It indicated that the exact anatomical condition of the petitioner at birth was unclear, as were all of the details of the operation and present circumstances. 395 F. Supp. at 1213.

"The case of *M.T. v. J.T.*, 140 N.J. Super. 77, 355 A.2d 204, *cert. denied* 71 N.J. 345 (1976), deserves greater attention, in our view, than *Corbett*, *Hartin*, or *Darnell*.

"In *M.T.*, a husband and wife were divorcing, and the issue was support and maintenance. The husband argued that he should not have to pay support to his wife because she was a male, making the marriage void. The issue before the court, similar to that before this court, was whether the marriage of a post-operative male-to-female transsexual and a male was a lawful marriage between a man and a woman. The court found that it was a valid marriage. 140 N.J. Super. at 90.

"In affirming the lower court's decision, the court noted the English court's previous decision in *Corbett*. 140 N.J. Super. at 85-86. The court rejected the reasoning of *Corbett*, though, finding that 'for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the person's gender, psyche or psychological sex, then identity by sex must be governed by the congruence of these standards.' 140 N.J. Super. at 87. Since the court found that the wife's gender and genitalia were no longer 'discordant' and had been harmonized by medical treatment, the court held that the wife was a female at the time of her marriage and that her husband, then, was obligated to support her. 140 N.J. Super. at 89-90.

"The importance of the holding in *M.T.* is that it replaces the biological sex test with dual tests of anatomy and gender, where 'for marital purposes if the anatomical or genital features of a genuine transsexual are made to conform to the per-

son's gender, psyche or psychological sex, then identity by sex must be governed by the congruence of these standards.' 140 N.J. Super. at 87.

"The *M.T.* court further stated:

'In this case the transsexual's gender and genitalia are no longer discordant; they have been harmonized through medical treatment. Plaintiff has become physically and psychologically unified and fully capable of sexual activity consistent with her reconciled sexual attributes of gender and anatomy. Consequently, plaintiff should be considered a member of the female sex for marital purposes. It follows that such an individual would have the capacity to enter into a valid marriage relationship with a person of the opposite sex and did so here. In so ruling we do no more than give legal effect to a *fait accompli*, based upon medical judgment and action which are irreversible. Such recognition will promote the individual's quest for inner peace and personal happiness, while in no way disserving any societal interest, principle of public order or precept of morality.' 140 N.J. Super. at 89-90.

"In *M.T.*, the husband was arguing that he did not owe any support because his wife was a man. However, in the record, it was stated that the wife had a sex reassignment operation after meeting the husband. Her husband paid for the operation. The husband later deserted the wife and then tried to get out of paying support to someone he had been living with since 1964 and had been married to for over 2 years.

"In 1977, the Oregon Supreme Court was faced with the issue of whether a birth certificate of a transsexual should be changed to reflect a different name and sex. *K. v. Health Division*, 277 Or. 371, 560 P.2d 1070 (1977). In *K.*, the court first looked to the statutes regarding birth certificate changes. The court found limited circumstances existed under the law for birth certificate amendments. The amendments, further, only dealt with name changes and only in the case of adoption or if a parent name changes. 277 Or. at 374-75.

"Despite the Court of Appeals finding that the birth certificate could be amended, the Oregon Supreme Court held that no such authority existed in Oregon to change the birth certificate to reflect a change in sex or name in this instance. 277 Or. at 374-76. The court stated that 'it has not been demonstrated, by legislative history or otherwise, that it would be "at variance with the apparent policy" of either the legislature or the State Board of Health to deny the issuance of a "new birth certificate" to a transsexual.' 277 Or. at 375. The court further stated:

'In our opinion, it is at least equally, if not more reasonable, to assume that in enacting these statutes it was the intent of the legislature of Oregon that a "birth certificate" is an historical record of the facts as they existed at the time of birth, subject to the specific exceptions provided by statute.' 277 Or. at 375.

"In so finding, the Supreme Court declared that 'it is not for this court to decide which view is preferable. On the contrary, we hold that this is a matter of public policy to be decided by the Oregon legislature.' 277 Or. at 376.

. . . .

"In 1984, the United States Court of Appeals, Seventh Circuit, analyzed an issue concerning transsexualism and workplace discrimination. In *Ulane v. Eastern Airlines*, Inc., 742 F.2d 1081 (7th Cir. 1984), *cert. denied* 471 U.S. 1017 (1985), a post-operative male-to-female transsexual who was a pilot for Eastern Airlines was fired in 1981, shortly after sex reassignment surgery. The transsexual sued the airline, alleging that the employer violated Title VII by discharging her from her position as a pilot. A federal district court agreed with the transsexual, finding discrimination against this person as both a female and a transsexual, and the airline appealed. 742 F.2d at 1082.

"The Seventh Circuit disagreed with the district court. The court stated that while it does not condone discrimination in any form, it must hold that Title VII does not protect transsexuals. 742 F.2d at 1084. First, the court stated: 'It is a maxim of statutory construction that, unless otherwise defined, words should be given their ordinary, common meaning.' 742 F.2d at 1085. The court explained that the words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder. It noted that the law clearly prohibits discrimination against women because they are women or men because they are men; it does not protect a person born with a male body who believes himself to be female or a person born with a female body who believes herself to be male. 742 F.2d at 1085.

"After noting that nothing was said in the legislative history about transsexuals, the court stated that it appears clear that Congress did not intend the legislation to apply to anything other than 'the traditional concept of sex.' 742 F.2d at 1085. Had Congress intended it to apply, surely it would have said so, the court explained. 742 F.2d at 1085. Thus, the court declined to expand the definition of 'sex' as used in Title VII beyond its 'common and traditional interpretation,' stating: 'We agree with the Eighth and Ninth Circuits that if the term "sex" as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress.' 742 F.2d at 1087. See *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748, 750 (8th Cir. 1982); *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662-63 (9th Cir. 1977).

"The two most recent decisions in the United States in the area of transsexualism have dealt with the precise issue before this court, that is, whether two individuals, biologically and legally of the same sex at birth, may contract to marry each other.

"In 1987, a probate court in Ohio addressed the question in the case of *In re Ladrach*, 32 Ohio Misc. 2d 6, 513 N.E.2d 828 (1987). In *Ladrach*, a post-operative male-to-female transsexual and the transsexual's fiancé, a biological male, applied for a marriage license. The application indicated that the transsexual had been married two times before to spouses of the female gender and that both marriages had ended in divorce.

"After reading the application, the clerk at the license bureau called a judge who reviewed the application. The judge also reviewed a signed letter by a physician indicating that the transsexual had undergone sex reassignment surgery.

After reviewing the marriage statute in Ohio, the judge concluded that the application must be denied. Later, the transsexual also filed a petition to have the sex corrected on the transsexual's birth certificate to state 'Girl' instead of 'Boy.' This application was dismissed, and the transsexual filed a complaint for declaratory judgment to have the birth certificate changed and the marriage license issued.

"The Ohio Probate Court found that the birth certificate, based on Ohio law, should not be changed. The court stated that its statute is a 'correction' type statute, which permits a court to correct errors such as spelling of names, dates, race and sex, if in fact there was an error. 32 Ohio Misc. 2d at 8. Since there was no error in the designation of the transsexual as a boy, the application, the court stated, must be dismissed as to the birth certificate change. 32 Ohio Misc. 2d at 8.

"The court concluded, after a review of prior case law, law review articles, and the posthearing brief of the applicant, that no authority existed in Ohio for the issuance of a marriage license to a post-operative male-to-female transsexual and a male person. 32 Ohio Misc. 2d at 10. If it is to be the public policy of the state of Ohio to issue marriage license in such cases, the court stated, 'it is this court's opinion that the legislature should change the statutes.' 32 Ohio Misc. 2d at 10.

"The most recent decision in the United States regarding transsexualism was decided by the Texas Court of Appeals in *Littleton v. Prange*, 9 S.W.3d 223 (Tex. Civ. App. 1999), *cert. denied* 531 U.S. 872 (2000). In J'Noel's case, the district court appears to rely heavily on this case in rendering its decision that J'Noel is a male, quoting some of its language verbatim. In *Littleton*, a transsexual, now called Christie, who was born a man but had undergone sex reassignment surgery, brought a medical malpractice suit under Texas' wrongful death statute as a surviving spouse of a male patient. The doctor who was sued filed a motion for summary judgment, asserting that Christie was a male and, therefore, could not be the surviving spouse of another man. The trial court granted summary judgment to the doctor, and Christie appealed.

"Christie had a name and sex change made on her birth certificate during pendency of the suit. During the surgical procedures, Christie's penis, scrotum, and testicles were removed, and a vagina and labia were constructed. Christie also had breast construction surgery. One of Christie's doctors testified that Christie 'has the capacity to function sexually as a female' after the surgery. 9 S.W.3d at 225. Doctors testified that medically Christie was a woman.

"Christie married a man by the name of Jonathon in 1989, approximately 9 or 10 years after sex reassignment surgery. The two lived together until Jonathon's death in 1996, after which time Christie filed suit against Jonathon's doctor. In Christie's affidavit, Christie asserted that Jonathon knew about Christie's background and sex reassignment surgery.

"The court in *Littleton* stated that in Texas, marriage must be between two parties of the opposite sex. 9 S.W.3d at 225. Further, in order for Christie to sue under the wrongful death statute in Texas, Christie must be the surviving spouse. 9 S.W.3d at 225. Thus, if Christie was a man, summary judgment would be ap-

propriate. After a brief review of what transsexualism is, the court next examined the case law in this area. The court discussed *Corbett* and the case of *Anonymous v. Anonymous*, 67 Misc. 2d 982, 325 N.Y.S.2d 499 (1971). The court also referenced such cases as *M.T. v. J.T.*, *In re Ladrach*, and *K. v. Health Division*. 9 S.W.3d at 227-29.

"After a review of the case law, the court concluded that Christie was a male as a matter of law. 9 S.W.3d at 231. The court noted that this was an issue of first impression in Texas. 9 S.W.3d at 230. In line with previous cases, the court stated: '[I]t is for the legislature, should it choose to do so, to determine what guidelines should govern the recognition of marriages involving transsexuals. . . . It would be intellectually impossible for this court to write a protocol for when transsexuals would be recognized as having successfully changed their sex.' 9 S.W.3d at 230.

"While Christie argued that amputation was ' "a pretty important step," ' the court, while agreeing, explained that it had 'no authority to fashion a new law on transsexuals, or anything else. We cannot make law when no law exists: we can only interpret the written word of our sister branch of government, the legislature.' 9 S.W.3d at 230.

"Thus, the court found that even though surgery and hormones can make a transsexual male look like a woman, including female genitalia, and in Christie's case, even breasts, transsexual medicine does not create the internal sex organs of a woman (except for a man-made vaginal canal). There is no womb, cervix, or ovaries in the post-operative transsexual female. The chromosomes do not change. Biologically, the post-operative female is still a male. 9 S.W.3d at 230. Even though some doctors would consider Christie a female and some a male, the court concluded: 'Her female anatomy, however, is all man-made. The body that Christie inhabits is a male body in all aspects other than what the physicians have supplied.' 9 S.W.3d at 231.

. . . .

"A petition for writ of certiorari of the *Littleton* holding was denied by the United States Supreme Court on October 2, 2000." 29 Kan. App. 2d at 1100-06.

J'Noel submitted a supplemental brief to this court in order to bring to the court's attention a decision of the Family Court of Australia, which is dated October 12, 2001. J'Noel refers to the new decision as *In re Kevin*, FamCA 1074 (File No. SY8136 OF 1999, Family Court of Australia, at Sydney, 2001). In that case, applicants, Kevin and Jennifer, sought a declaration of the validity of their marriage. Kevin (f.k.a. Kimberley) is a female-to-male transsexual. His birth certificate recorded his sex as "female," but Kevin always considered himself to be a male. Kevin met Jennifer in October 1996. He told her of "his transsexual predicament." They began living together in February 1997 and agreed to marry.

In November 1977, Kevin had breast reduction surgery, and in September 1998 he had "a total hysterectomy with bilateral oophorectomy." Slip op. at 8. Kevin has elected not to undergo further surgery involving construction of a penis or testes. Due to hormone treatments, Kevin's voice has deepened and he has coarse hair growth on his face, chest, legs, and stomach. In October 1998, Kevin was issued a new birth certificate showing his sex as "male," and he and Jennifer were married.

Jennifer became pregnant through in vitro fertilization with donated sperm and gave birth in November 1999. The couple plans to have another child in this way. Kevin's history of transsexuality was made known to the infertility clinic where he and Jennifer applied for treatment, and after full consideration by a team of scientists, physicians, and nurses " 'it was decided that Kevin and Jennifer be considered a heterosexual couple with infertility consequent to absent sperm production.' " Slip op. at 10.

Two psychiatrists examined Kevin. Both concluded that Kevin is and always has been psychologically male. One wrote that he believed Kevin's " 'brain sex or mental sex is male,' " and then stated his agreement with the opinion of Milton Diamond, an American professor of anatomy and reproductive biology, " 'that further research will confirm the present evidence that brain sex or mental sex is a reality which would explain the persistence of a gender identity in the face of or contrary to external influences.' " Slip op. at 11.

The record in the Australian case was richly and comprehensively developed, in sharp contrast with the record in the case before us. In *In re Kevin*, the court had the benefit of the testimony of many people who were colleagues, friends, and family of Jennifer and Kevin, as well as volumes of medical and scientific evidence.

Here, the district court's conclusion of law, based on its findings of fact, was that "J'Noel is a male." In other words, the district court concluded as a matter of law that J'Noel is a male and granted summary judgment on that basis.

The district court stated that it had considered conflicting medical opinions on whether J'Noel was male or female. This is not

the sort of factual dispute that would preclude summary judgment because what the district court actually took into account was the medical experts' opinions on the ultimate question. The district court did not take into account the factors on which the scientific experts based their opinions on the ultimate question. The district court relied entirely on the Texas court's opinion in *Littleton* for the "facts" on which it based its conclusion of law. There were no expert witnesses or medical testimony as to whether J'Noel was a male or female. The only medical evidence was the medical report as to the reassignment surgery attached to J'Noel's memorandum in support of her motion for partial summary judgment. There was included a "To Whom It May Concern" notarized letter signed by Dr. Schrang in which the doctor wrote: "She should now be considered a functioning, anatomical female."

The Court of Appeals found deficiency in the district court's entry of summary judgment. Supplying some of what the district court omitted, the Court of Appeals included in its opinion a review of some scientific literature. As courts typically do, the Court of Appeals also turned to a law journal article that reported on scientific matters relevant to legal issues. The Court of Appeals quoted extensively from Greenberg, *Defining Male and Female: Intersexuality and the Collision between Law and Biology*, 41 Ariz. L. Rev. 265, 278-92 (1999). 29 Kan. App. 2d at 101-09. Professor Greenberg's thesis is that sexual identification is not simply a matter of anatomy, as demonstrated by a number of intersex conditions — chromosomal sex disorders, gonadal sex disorders, internal organ anomalies, external organ anomalies, hormonal disorders, gender identity disorder, and unintentioned amputation.

Thus, the essential difference between the line of cases, including *Corbett* and *Littleton*, that would invalidate the Gardiner marriage and the line of cases, including *M.T.* and *In re Kevin*, that would validate it is that the former treats a person's sex as a matter of law and the latter treats a person's sex as a matter of fact. In *Littleton*, the thread running throughout the majority's opinion was that a person's gender was immutably fixed by our Creator at birth. 9 S.W.3d at 224. Summing up its view of Christie's mission to be accepted as a male, the court stated: "There are some things we

cannot will into being. They just are." 9 S.W.3d at 231. *Corbett* was approvingly described by the Texas majority as holding, "once a man, always a man." 9 S.W.3d at 227. The Texas court decided that there was nothing for a jury to decide, and "[t]here are no significant facts that need to be decided." 9 S.W.3d at 230. Because "Christie was created and born a male," the Texas court "h[e]ld, *as a matter of law*, that Christie Littleton is a male." (Emphasis added.) 9 S.W.3d at 231.

In contrast, the Australian court stated:

"It will be necessary to identify whether particular propositions in the reasoning are statements of fact or of law. I take it to be a question of law what criteria should be applied in determining whether a person is a man or a woman for the purpose of the law of marriage, and a question of fact whether the criteria exist in a particular case." *In re Kevin*, slip op. at 17.

The Australian court's analytical approach echoes that of our Court of Appeals. Indeed, *Gardiner* is cited and discussed by the Australian court. Slip op. at 44-45, 51-52.

The Court of Appeals rejected the district court's sex-at-birth-answers-the-question rationale in part, at least, because the Court of Appeals opined that there are a number of factors that make sexual identification at birth less than certain. In chromosomal sex disorders, the chromosomal pattern does not fit into the XX and XY binary system. Among the chromosomal sex disorders described by Greenberg are Klinefelter Syndrome, which affects approximately 1 in 500 to 1,000 babies identified at birth as males based on the appearance of external genitalia, in which multiple X chromosomes may become manifest in puberty with breast development. Turner Syndrome affects babies identified at birth as females, who in fact typically have only one X chromosome. As a result, a person with Turner Syndrome will have female appearing genitalia but may have unformed and nonfunctioning gonads. What the district court said about J'Noel, that "[t]here is no womb, cervix or ovaries," also could be true for a person with Turner Syndrome who had been identified as a female at birth. Other anomalies and conditions that could not be accounted for in the district court's approach are discussed in the Court of Appeals' quotation of

Greenberg at 29 Kan. App. 2d at 103-07. However, that is not the issue that is before this court in this appeal.

The district court concluded as a matter of law that J'Noel was a male because she had been identified on the basis of her external genitalia at birth as a male. The Court of Appeals held that other criteria should be applied in determining whether J'Noel is a man or a woman for the purpose of the law of marriage and remanded in order for the district court to apply the criteria to the facts of this case. In this case of first impression, the Court of Appeals adopted the criteria set forth by Professor Greenberg in addition to chromosomes: "gonadal sex, internal morphologic sex, external morphologic sex, hormonal sex, phenotypic sex, assigned sex and gender of rearing, and sexual identity," as well as other criteria that may emerge with scientific advances. 29 Kan. App. 2d at 127.

The harmonizing of psychological and anatomical sex was the touchstone for the New Jersey court. It also was the touchstone for the Australian court. The New Jersey court reasoned that a person who has become physically and psychologically unified and fully capable of sexual activity consistent with her reconciled psychological sexual attributes should be considered a member of the reassigned sex for marital purposes:

"In this case the transsexual's gender and genitalia are no longer discordant; they have been harmonized through medical treatment. Plaintiff has become physically and psychologically unified and fully capable of sexual activity consistent with her reconciled sexual attributes of gender and anatomy. Consequently, plaintiff should be considered a member of the female sex for marital purposes. It follows that such an individual would have the capacity to enter into a valid marriage relationship with a person of the opposite sex and did do so here. In so ruling we do no more than give legal effect to a *fait accompli*, based upon medical judgment and action which are irreversible." *M.T.*, 140 N.J. Super at 89-90.

The Australian court, too, concluded that the law should treat post-operative transsexuals as members of their reassigned sex. Critical to the court's determination was successful reassignment surgery.

On appeal, J'Noel argues that the marriage is valid under Kansas law. However, in the district court, J'Noel's sole argument was that the marriage was valid under Wisconsin law and Kansas must give full faith and credit to Wisconsin law. In fact, J'Noel argued that

the validity of the marriage under Kansas law was not an issue in this case and intimated the marriage would be prohibited under K.S.A. 2001 Supp. 23-101. She argued, in part:

"The way that counsel for Joe Gardiner portrayed this issue, I think, is perhaps very clever and it's probably something that I would have done if I were in his shoes. He said, can someone change their sex? Does a medical doctor or a judge have the right to change somebody's sex?

"And the answer to that may, in fact, be no, but I think the more interesting question, and the question that's really before the Court is one which I think was addressed by Counsel, and that is—perhaps that is an issue for the State legislature to deal with. In Wisconsin the State legislature has clearly held this issue. The statute in Wisconsin is clear, and this statute has been cited in the brief.

. . . .

"However, we would urge the Court to rule on our motion favorably with respect to the sexual identity of Miss Gardiner and we would urge the Court to rule that as a matter of summary judgment she is, in fact, a female entitled, under the listed very narrow interpretation of Wisconsin law.

. . . .

". . . Does this, in fact, make J'Noel Gardiner a man—from a man to a woman?

"I think the answer is, well, no, not technically speaking, but we're not talking about technically. We're talking about that as a matter of law, not technically, not talking scientifically. . . .

"In this case, the Wisconsin legislature clearly contemplated a person who had sexual reassignment surgery is allowed to change her sexual identity in conformance with the surgery that transpired.

. . . .

"Going onto the sexual identity question, I think that counsel for Joe Gardiner have very cleverly tried to posture the questions differently than it actually exists. This is really a very simple, straightforward matter. The question is, does Kansas need to give full faith and credit to the Wisconsin statute and court order and the birth certificate that order created under Wisconsin law?

"I think the answer to that is clearly yes. This Court is not being asked to determine whether or not J'Noel Gardiner is, in fact, a male or female. That is simply not a matter that is before this Court on this motion for summary judgment, and we would submit even at the time of trial. Surgeons may testify as to certain scientific facts and they may disagree as to whether or not that Miss Gardiner is, in fact, a male or a female.

. . . .

"There is no need for this Court to make a decision of whether or not Miss Gardiner is in fact, a man or a woman. That's simply not a matter before this Court. The issue is whether or not Wisconsin is allowed to create their own laws and whether those laws and those decisions made by a Wisconsin tribunal and

the administrative acts that follow that court order are in fact something that this Court is bound to follow.

. . . .

"[W]e're not asking the Court to approve or disapprove of issues that relate to transsexuals marrying. We really encourage the Court to look at the very, very narrow issue here.

"Clearly, there's issues for the Kansas legislature to look at, and I don't think this Court or any other Court in Kansas should impose its own opinions on the legislature, but I think this Court does have a responsibility to enforce the law as it applies in other states to Kansas and give those other states full faith and credit."

The district court granted summary judgment, finding the marriage void under K.S.A. 2001 Supp. 23-101. Summary judgment is appropriate when there is no genuine issue of material fact. *Bergstrom v. Noah*, 266 Kan. 847, 871, 974 P.2d 531 (1999). Here, the parties have supplied and agreed to the material facts necessary to resolve this issue. There are no disputed material facts. We disagree with the decision reached by the Court of Appeals. We view the issue in this appeal to be one of law and not fact. The resolution of this issue involves the interpretation of K.S.A. 2001 Supp. 23-101. The interpretation of a statute is a question of law, and this court has unlimited appellate review. *State v. Lewis*, 263 Kan. 843, 847, 953 P.2d 1016 (1998).

The fundamental rule of statutory construction is that the intent of the legislature governs. In determining legislative intent, courts are not limited to consideration of the language used in the statute, but may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. *Sowers v. Tsamolias*, 23 Kan. App. 2d 270, 273, 929 P.2d 188 (1996). Words in common usage are to be given their natural and ordinary meaning. *State v. Heffelman*, 256 Kan. 384, 886 P.2d 823 (1994). When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

The words "sex," "male," and "female" are words in common usage and understood by the general population. Black's Law

Dictionary, 1375 (6th ed. 1999) defines "sex" as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female." Webster's New Twentieth Century Dictionary (2nd ed. 1970) states the initial definition of sex as "either of the two divisions of organisms distinguished as male or female; males or females (especially men or women) collectively." "Male" is defined as "designating or of the sex that fertilizes the ovum and begets offspring: opposed to *female.*" "Female" is defined as "designating or of the sex that produces ova and bears offspring: opposed to *male.*" [Emphasis added.] According to Black's Law Dictionary, 972 (6th ed. 1999) a marriage "is the legal status, condition, or relation of one man and one woman united in law for life, or until divorced, for the discharge to each other and the community of the duties legally incumbent on those whose association is founded on the distinction of sex."

The words "sex," "male," and "female" in everyday understanding do not encompass transsexuals. The plain, ordinary meaning of "persons of the opposite sex" contemplates a biological man and a biological woman and not persons who are experiencing gender dysphoria. A male-to-female post-operative transsexual does not fit the definition of a female. The male organs have been removed, but the ability to "produce ova and bear offspring" does not and never did exist. There is no womb, cervix, or ovaries, nor is there any change in his chromosomes. As the *Littleton* court noted, the transsexual still "inhabits . . . a male body in all aspects other than what the physicians have supplied." 9 S.W.3d at 231. J'Noel does not fit the common meaning of female.

That interpretation of K.S.A. 2001 Supp. 23-101 is supported by the legislative history of the statute. That legislative history is set out in the Court of Appeals decision:

"The amendment to 23-101 limiting marriage to two parties of the opposite sex began its legislative history in 1975. The minutes of the Senate Committee on Judiciary for January 21, 1976, state that the amendment would 'affirm the traditional view of marriage.' The proposed amendment was finally enacted in 1980.

"K.S.A. 23-101 was again amended in 1996, when language was added, stating: 'All other marriages are declared to be contrary to the public policy of this state

and are void.' This sentence was inserted immediately after the sentence limiting marriage to two parties of the opposite sex.

"In 1996, K.S.A. 23-115 was amended, with language added stating: 'It is the strong public policy of this state only to recognize as valid marriages from other states that are between a man and a woman.' " 29 Kan. App. 2d at 99.

## The Court of Appeals then noted:

"The legislative history contains discussions about gays and lesbians, but nowhere is there any testimony that specifically states that marriage should be prohibited by two parties if one is a post-operative male-to-female or female-to-male transsexual. Thus, the question remains: Was J'Noel a female at the time the license was issued for the purpose of the statute?" 29 Kan. App. 2d at 100.

We do not agree that the question remains. We view the legislative silence to indicate that transsexuals are not included. If the legislature intended to include transsexuals, it could have been a simple matter to have done so. We apply the rules of statutory construction to ascertain the legislative intent as expressed in the statute. We do not read into a statute something that does not come within the wording of the statute. *Joe Self Chevrolet, Inc. v. Board of Sedgwick County Comm'rs*, 247 Kan. 625, 633, 802 P.2d 1231 (1990).

In *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984), the federal district court, like the Court of Appeals here, held sex identity was not just a matter of chromosomes at birth, but was in part a psychological, self-perception, and social question. In reversing the district court, the Seventh Circuit stated:

"In our view, to include transsexuals within the reach of Title VII far exceeds mere statutory interpretation. Congress had a narrow view of sex in mind when it passed the Civil Rights Act, and it has rejected subsequent attempts to broaden the scope of its original interpretation. For us to now hold that Title VII protects transsexuals would take us out of the realm of interpreting and reviewing and into the realm of legislating. See *Gunnison v. Commissioner*, 461 F.2d 496, 499 (7th Cir. 1972) (it is for the legislature, not the courts, to expand the class of people protected by a statute). This we must not and will not do.

"Congress has a right to deliberate on whether it wants such a broad sweeping of the untraditional and unusual within the term 'sex' as used in Title VII. Only Congress can consider all the ramifications to society of such a broad view. We do not believe that the interpretation of the word 'sex' as used in the statute is a mere matter of expert medical testimony or the credibility of witnesses produced in court. Congress may, at some future time, have some interest in testimony of

that type, but it does not control our interpretation of Title VII based on the legislative history or lack thereof. If Congress believes that transsexuals should enjoy the protection of Title VII, it may so provide. Until that time, however, we decline in behalf of the Congress to judicially expand the definition of sex as used in Title VII beyond its common and traditional interpretation." 742 F.2d at 1086.

We agree with the Seventh Circuit's analysis in *Ulane*. It is well reasoned and logical. Although *Ulane* involves sex discrimination against Ulane as a transsexual and as a female under Title VII, the similarity of the basic issue and facts to the present case make it both instructive and persuasive. As we have previously noted, the legislature clearly viewed "opposite sex" in the narrow traditional sense. The legislature has declared that the public policy of this state is to recognize only the traditional marriage between "two parties who are of the opposite sex," and all other marriages are against public policy and void. We cannot ignore what the legislature has declared to be the public policy of this state. Our responsibility is to interpret K.S.A. 2001 Supp. 23-101 and not to rewrite it. That is for the legislature to do if it so desires. If the legislature wishes to change public policy, it is free to do so; we are not. To conclude that J'Noel is of the opposite sex of Marshall would require that we rewrite K.S.A. 2001 Supp. 23-101.

Finally, we recognize that J'Noel has traveled a long and difficult road. J'Noel has undergone electrolysis, thermolysis, tracheal shave, hormone injections, extensive counseling, and reassignment surgery. Unfortunately, after all that, J'Noel remains a transsexual, and a male for purposes of marriage under K.S.A. 2001 Supp. 23-101. We are not blind to the stress and pain experienced by one who is born a male but perceives oneself as a female. We recognize that there are people who do not fit neatly into the commonly recognized category of male or female, and to many life becomes an ordeal. However, the validity of J'Noel's marriage to Marshall is a question of public policy to be addressed by the legislature and not by this court.

The Court of Appeals is affirmed in part and reversed in part; the district court is affirmed.

DAVIS, J., not participating.

BRAZIL, S.J., assigned▪